BOARD OF TRUSTEES OF WESTON COUNTY SCHOOL DISTRICT NO. 1, WESTON COUNTY, Wyoming (John Ratigan, William Stearns, Ted Elliott, Robert Engle, Lyle Sylte, Max Decker, Fred Ertman, Jerry Dixon, and James Griffin, in their official capacity) Appellants (Some of defendants below),

v.

David L. HOLSO, Appellee (Plaintiff below).

A. L. ALBERT, Individually, Appellant (One of defendants below),

v.

David L. HOLSO, Appellee (Plaintiff below).

Nos. 4807, 4808.

Supreme Court of Wyoming.

Aug. 28, 1978.

Rehearing Denied Nov. 21, 1978.
See 587 P.2d 203.

Thomas L. Whitley, Newcastle and William A. Harding, Lincoln, Neb., for all appellants.

Patrick E. Hacker of Patrick E. Hacker & Associates, and Richard S. Rideout, Cheyenne, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

Defendants, members of the Board of Trustees of Weston County School District No. 1, in their official capacity, and A. L. Albert, individually, appeal from the judgment of the Sixth Judicial District Court, which reinstated the plaintiff as a teacher in the District with back pay and other benefits, and awarded him compensatory damages and attorney's fees. In addition to his petition for review of his termination, plaintiff asked damages in tort against the Board for malicious interference with his opportunity to pursue his professional career, and damages pursuant to 42 U.S.C., § 1983,[1] against Albert, the Superintendent of the District, for attempting to deprive plaintiff of his teaching career on the basis of constitutionally impermissible · reasons. These consolidated appeals concern the propriety of every aspect of the judgment below.

We will affirm the district court judgment, which reversed the School Board's decision terminating the plaintiff, and which judgment also awarded damages and attorney's fees against Albert under the applicable federal statutes. We will reverse the judgment against the Board.

When the issue of his termination arose, plaintiff, David L. Holso, was a continuing contract teacher in his eighth year as an English teacher in the District. On March 12, 1975, the Board met in regular session to discuss contract renewals, with plaintiff's principal, Glenn Gregson, who presented a favorable evaluation of the plaintiff and recommended that he be retained. In spite of this, the members of the School Board and Superintendent Albert questioned plaintiff's performance as a teacher, particularly in the areas of his classroom discipline, his student grading, and his personal health problems. The Board directed Gregson to make a further evaluation of plaintiff and certain other teachers. Gregson

---

1. 42 U.S.C. § 1983 provides:

 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

testified at the plaintiff's termination hearing and at trial that he had received the impression that the Board was "out to get" Mr. Holso. On the morning of March 13, Gregson conveyed this impression to Holso, explaining that the Board was upset with his relationship with a female teacher, as well as his classroom discipline, and was also concerned about Mr. Holso's personal health problems. Later that morning, plaintiff and Gregson met with Superintendent Albert to discuss the complaints and there is conflicting evidence concerning the substance of this discussion. Plaintiff testified that Albert specifically commented on plaintiff's relationship with another teacher, saying that he (Albert) had observed plaintiff's automobile parked overnight in front of the female teacher's home during the 1974 Christmas vacation. Plaintiff further testified that the conversation had to do with plaintiff's health, as well as his failure to turn in a requested course outline. All of these matters will be discussed in greater detail later in the opinion. Mr. Holso further testified that Albert said he wasn't interested in Holso's explanations, and if he insisted on a termination hearing there wouldn't be a school in the country that would offer him a teaching job after Albert got through with him. Albert denied that he discussed plaintiff's purported immorality, or that he threatened plaintiff. He insisted that the reason he pursued plaintiff's termination was because Gregson had changed his mind and was urging that Holso be fired. Gregson consistently denied this and testified that he had *never* recommended plaintiff's termination.

On the afternoon of March 13, Albert and Gregson met with the attorney for the School Board, which meeting culminated in the mailing of a letter to plaintiff, the substance of which was that Albert was recommending plaintiff's termination to the Board for the following reasons:

"1. Your physical handicap and your neglect of the care of your health which results in (a) an unusual number of absences from the classroom; (b) an inability to work up to your potential after your

return from absences and when your health is neglected.

"2. Insubordination including but not limited to (a) failure to follow directions in the preparation and coordination of outlines of course contents; (b) failure to hold meetings as directed; (c) failure to attend meetings or contribute to meetings when you do attend.

"3. Other conduct that constitutes good and just cause for termination."

Concerning the general allegation of other "good and just cause," Albert testified at the termination hearing that plaintiff's alleged immorality was included as one of the significant reasons for his recommendation. Also included—as is disclosed by the Board's findings—was an allegation that plaintiff's grading of students was questionable.

Due to the rumors which had circulated concerning the termination proceedings initiated against him, plaintiff, on April 3rd, spent portions of several class periods answering student's questions and explaining his understanding of the grounds for his termination. Although testimony at the hearing varied as to the amount of time spent in such discussions and on the question of whether plaintiff initiated the discourse, none of the students who testified thought plaintiff had attempted to solicit student support. Superintendent Albert was notified of the class discussions by a board member. After investigation by the school attorney, Albert, on April 6, ordered plaintiff's suspension pending the outcome of the termination proceedings.

Subsequent to a hearing before the Board, commencing April 17, the suspension of April 6 was approved and plaintiff was terminated, based on the following Findings of Fact and Conclusions of Law:

"1—The illnesses of David E. Holso (diabetes and ileostomy) interfere with his professional responsibility in the classroom and cause him to be absent from classes for substantial periods of time. On the occasions of his absences, he has failed to notify the principal's office and

the absences result in inattention to school work by the students. Mr. Holso has not carefully observed his diet and has on occasion not carefully controlled his diabetic condition. Mr. Holso failed to follow the direction of the principal that he notify the principal's office each time he found it necessary to leave his room during a class period.

"2—Mr. Holso failed to complete and hand in a specific assignment of work required by his superior, Mrs. Betty Shurley. He was reminded to do so on several occasions at meetings by Mrs. Shurley and by his principal, Glenn Gregson. The assignment was the preparation of a class outline or syllabus which was to be a significant part of a booklet designed to coordinate the curriculum of English classes from kindergarten through 12th grade in Newcastle schools. Mr. Holso did not complete or hand in this work until six days after his notice of termination was given and after the booklet was assembled without his work. Mr. Holso admitted that he failed to cooperate with the head of the English department and failed to hold a high school English teachers meeting that he was directed to hold. The failure to hold the meeting was not excused by any facts shown.

"3—Mr. Holso's grading is questionable and the record of the grades he has given shows an excessive number of D's and F's over the last seven years, all of which indicates that his teaching is inadequate.

"A teacher's right to grade any particular paper or student as the teacher sees fit to do should not be limited but Mr. Holso's grading, when studied over the last seven years, shows such an unusually excessive number of F's and D's that it indicates that he has been and is an inadequate teacher.

"4—On April 3, 1975, David E. Holso spent the major part of the 3rd, 4th, 5th and 6th period classes talking to his students in those classes about the specific grounds for his termination. The discussions were initiated by him and were not initiated by questions from the students. In his second period class he also initiated

the discussion but spent less time talking about the matter. On April 3, 1975, although no specific charge of immorality had been made in the notice of termination, he injected that problem into the discussion he initiated with the students."

"CONCLUSIONS OF LAW

"1—Mr. Holso's illness and his failure properly to care for his health interfered with his performance in the classroom to the extent that it is good and sufficient cause for his termination.

"2—Mr. Holso, because of his failure to perform specific assignments of his superiors, his failure to cooperate and his failure to hold a meeting as directed by his superior and his failure to notify the principal's office each time it was necessary for him to leave his classroom was insubordinate and such insubordination is sufficient cause for his termination.

"3—The record of the grades Mr. Holso has given over the last seven years shows an unusually excessive number of F's and D's and it indicates that he is and has been an inadequate teacher and that fact is good and sufficient cause for terminating his contract.

"4—Mr. Holso's actions in the classroom on April 3, 1975, constituted unprofessional conduct and were not necessary to control or teach his students. His actions were good and sufficient cause to remove him from the classroom and suspend him for the remainder of the year. To place him back in the classroom after his students have had to testify in his proceeding would, in this particular case, not be in the best interest of the students. We approve the suspension of David E. Holso that was made on April 6, 1975."

Confronted with the district court's judgment reversing the Board's decision, and awarding plaintiff damages, we will consider the following issues:

1. Whether the Board's decision to terminate and suspend plaintiff was supported by substantial evidence;

2. Whether the district court erred in finding tort liability on the part of the Board;

3. Whether the district court erred in finding that Albert had violated 42 U.S.C. § 1983;

4. Whether the district court erred in assessing damages and attorney's fees against Albert.

## "GOOD CAUSE" FOR TERMINATION

■ When contemplating appeals pertaining to the termination of a continuing contract teacher, this court is committed to the view that not only must there be "good cause" and substantial evidence in support of the charges, but, in addition, the facts to sustain such charges must bear reasonable relationship to the teacher's fitness or capacity to perform his duties in that position. *Powell v. Board of Trustees of Crook County School District No. 1,* Wyo., 550 P.2d 1112, 1119. See, *Monahan v. Board of Trustees of Elementary School District No. 9,* Wyo., 486 P.2d 235, 237; and *Roush v. Sweetwater County School District No. 1,* Wyo., 497 P.2d 540, 542. In *Board of Trustees, Laramie County School District No. 1 v. Spiegel,* Wyo., 549 P.2d 1161, we addressed a situation where the district court had reversed a school board's determination, and we held

" ' . . . that the only direct items of evidence against him, all of which were admitted to, and corrected, by him, were so trivial and so remote from the date of the hearing that they did not justify termination, and that to base termination on those incidents would be oppressively harsh; . . . ' " 549 P.2d at 1177.

We set out the appropriate standards for reviewing such decisions in *Spiegel,* and they, therefore, need not be repeated here.

In the instant case, the district court entered the following findings:

"1. That the finding that Plaintiff's illnesses (diabetes and ileostomy) interfered with his professional responsibility in the classroom and caused him to be absent from his classes for substantial periods of time is not supported by substantial evidence.

"2. As to the finding that Plaintiff's actions in regard to Mrs. Shurley constitute insubordination, it is questionable whether the actions listed constitute insubordination, and in any event, the actions listed are not such as to constitute good cause for termination of Plaintiff's continuing contract.

"3. That the finding that Plaintiff's grading was questionable is not supported by substantial evidence and to terminate his contract without further facts would be arbitrary.

"4. That in regard to the finding that Plaintiff discussed his termination with students on April 3, 1975, this was a difficult time for both Plaintiff and the School District and whether Plaintiff's statements were in response to questions from students or not, there is no evidence that his statements in any way harmed the students or damaged their education and under all of the circumstances, Plaintiff's actions do not constitute good cause to terminate or suspend him."

## HEALTH

■ The testimony before the Board was that on only two occasions—one, one and one-half years, and the other two and one-half years, prior to the hearing—had plaintiff's health interfered with his classroom duties. The School District Rules provide that each year a teacher is granted ten days' sick leave, and plaintiff never exceeded this limit. The evidence was that plaintiff had left his classroom unattended for brief periods to take care of his ileostomy. Plaintiff's doctor testified that plaintiff's severe diabetic condition was under pretty good control. We must agree with the trial court that these trivial incidents do not establish cause for the termination and, therefore, do not support the finding of the Board. *Board of Trustees v. Spiegel,* supra.

## GRADING

■ Exhibits compiled by Superintendent Albert disclosed that plaintiff historically gave more D and F grades than would appear on a normal probability curve. No

grade analysis was made for the 1974–1975 school year—which immediately preceded the non-renewal of plaintiff's contract. The school district has no formal grading policy, nor was the plaintiff ever told to grade "on the curve." Cause for termination cannot be established by proof of the violation of standards that do not exist. Again, we agree with the district court's conclusion. We will return to this area when discussing the § 1983 action against Superintendent Albert.

## CLASS DISCUSSION

■ We have already set forth most of the evidence concerning this allegation. In addition to the circumstances that these discussions did take place, there was uncontradicted testimony before the Board, by the substitute who filled in for the plaintiff after his suspension, that no adverse impacts were observed in the plaintiff's classes. Furthermore, several other teachers testified that the plaintiff's approach—in responding to rumors—was not necessarily inappropriate. We must sustain the district court's finding. The incident is too trivial and detached from the teacher's ability and fitness to perform his duties. *Powell v. Board of Trustees,* supra; *Monahan v. Board of Trustees,* supra; *Roush v. Sweetwater County School District,* supra; and *Board of Trustees v. Spiegel,* supra.

## INSUBORDINATION

We have taken this allegation out of order because the Board places its greatest reliance to justify the termination on this charge. We are here concerned with essentially two incidents—both involving the plaintiff's superior in the English Department, Mrs. Betty Shurley. The first, and most important, incident relates to plaintiff's failure to timely submit a class outline. All English teachers were requested to turn in these outlines by October 25, 1974, but Mr. Holso failed to do so until

March 19, 1975, and testified at the Board hearing that he had simply forgotten about the assignment. Mrs. Shurley testified that she was not too concerned about Mr. Holso's lack of attention to the problem until January, 1975, at which time she wished to compile the outlines into book form. Mrs. Shurley notified other teachers in January to turn in their outlines, but did not make this request of the plaintiff. She did, however, contact Gregson and Albert and they asked Mr. Holso to turn in the assignment.

The second incident involved a request by Mrs. Shurley of the plaintiff, asking that he call and hold an English meeting in November, 1974, at which time Mrs. Shurley planned to be away from the school. Plaintiff attempted to comply with this assignment but was unable to do so because of scheduling conflicts encountered by the other teachers.

Principal Gregson testified at the Board hearing that he was aware of a conflict between plaintiff and Mrs. Shurley, but felt it went back to a difference in educational philosophy. Mrs. Shurley and Mr. Holso were conscious of their differences, and, on March 11, 1975, they met with Gregson to discuss and attempt to resolve them. As a result of the meeting, Mrs. Shurley related at the Board hearing that even though the plaintiff had not fully cooperated with her, some progress had been made in establishing rapport, and she had not actively sought Mr. Holso's termination.

■ "Insubordination," as a ground for suspension, dismissal or termination under § 21–7–110, W.S.1977 [§ 21.1–160, W.S.1957, 1975 Cum.Supp.], is, as yet, an undefined term.[2] Other courts have embraced the following definition:

" . . 'constant or continuing intentional refusal to obey a direct or implied order, reasonable in nature, and given by and with proper authority.'" *Ray v. Minneapolis Board of Education, Special School District No. 1,* 295 Minn. 13,

---

2. Section 21–7–110, W.S.1977, provides in pertinent part that

 "(a) The board may suspend or dismiss any teacher for incompetency, neglect of duty, immorality, insubordination or any other good or just cause."

202 N.W.2d 375, 378, citing *Shockley v. Board of Education*, 51 Del. 537, 541, 149 A.2d 331, 334, reversed on other grounds, 52 Del. 237, 155 A.2d 323.

Certain jurisdictions have held that "insubordination" includes a willful refusal of a teacher to obey reasonable rules and regulations. *State Tenure Commission v. Madison County Board of Education*, 282 Ala. 658, 213 So.2d 823, 834. The better-reasoned decisions place emphasis on the presence of a persistent course of willful defiance. See, e. g., *Fernald v. City of Ellsworth Superintending School Committee*, Me., 342 A.2d 704, 708; and *Johnson v. United School District Joint School Board*, 201 Pa.Super. 117, 191 A.2d 897, 901. See, generally, 78 A.L.R.3d 83, "Dismissal of Teachers—'Insubordination'" (1977). We embrace these definitions and concepts. To constitute insubordination as a cause for termination, it must be established that the teacher embarked upon a persistent course of willful defiance.

■ We agree with the district court that—applying the accepted definitions of "insubordination"—there is no substantial evidence of misconduct in this respect. We have before us two isolated incidents of a failure to carry out a superior's request, arising from at most a lack of communication which had improved by the time the Board held its hearing. There was no substantial evidence of a persistent course of conduct characterized by willful defiance.

The district court properly ordered plaintiff's reinstatement with back pay and benefits.

## BOARD'S LIABILITY IN TORT

Plaintiff contends that he is entitled to compensatory and punitive damages because of the Board's malicious interference with his professional career. Liability, according to the plaintiff, arises from the Board's alleged action in seeking to carry out Albert's threat made when he told the plaintiff:

"When I get through with you there won't be a school in the country that will offer you a teaching job."

The gravamen of this cause of action—as set out in plaintiff's brief—is the "unlawful tortious interference *by a third person* with the right of another to dispose of his labor." [Emphasis supplied]

Appropriately labeled, plaintiff is seeking relief for "interference with prospective advantage," as opposed to "interference with contractual relations." Prosser, Law of Torts, §§ 129 and 130 (4th Ed. 1971). These separate causes of action tend to merge, except that the latter is aimed at the protection of the "probable expectancies" of life, such as future contractual relations. Prosser, supra, § 130, at 950. The Court of Appeals of Washington, in *Olson v. Scholes*, 17 Wash.App. 383, 563 P.2d 1275, 1279–1280, summarized the elements of such actions— while at the same time implicitly indicating how the actions arise from common foundations—as follows:

" . . . The theory advanced is that stated in Restatement of Torts § 766 (1939), as follows:

" . . . [O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another

is liable to the other for the harm caused thereby.

The tort as defined in the Restatement is divided into two parts: (a) dealing with the cause of action arising when a third person induces a breach of contract, and (b) dealing with the cause of action which arises when a third person induces one person not to enter into a contract with another. The first subsection deals with present relationships, and the second with future relationships. The elements of the tort have been stated as:

(1) the existence of a valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

See *King v. Seattle,* 84 Wash.2d 239, 525 P.2d 228 (1974); *Scymanski v. Dufault,* 80 Wash.2d 77, 491 P.2d 1050 (1971); *Corinthian Corp. v. White & Bollard, Inc.,* 74 Wash.2d 50, 442 P.2d 950 (1968), and *Calbom v. Knudtzon,* 65 Wash.2d 157, 396 P.2d 148 (1964), inter alia."

See, also, 45 Am.Jur.2d, Interference, §§ 50 and 51; and 86 C.J.S. Torts § 43.

■ *These theories, however, do not apply to actions between parties to an existing contract*—they lie only against outsiders who interfere with the contractual expectancies of others. *Olson v. Scholes,* supra. An employer-employee relationship existed at the time of the alleged tortious acts, and, therefore, no recovery against the Board can be based upon the tort theory of interference with prospective advantage. We hold that the district court erred in entering a judgment against the Board on the basis of this theory.

Indeed, we have said that a judgment will be affirmed on any legal ground appearing in the record. *P & M Cattle Co. v. Holler,* Wyo., 559 P.2d 1019, 1024, inter alia. We are unable, however, to find any such grounds in this case. See, *Durst v. School District No. 2 of Niobrara County,* 39 Wyo. 442, 273 P. 675, which precludes recovery of damages to the business reputation or for mental suffering by a wrongfully discharged school teacher. See generally, 78 C.J.S. Schools and School Districts § 216. We reach no decision with respect to the propriety of a 42 U.S.C. § 1983 cause of action against the Board, since that issue was not raised below.[3]

3. We would be remiss, however, in failing to note the recent United States Supreme Court's decision, which held that local government entities, including school boards, are "persons" under § 1983 and, therefore, not entitled to

## ALBERT'S LIABILITY UNDER 42 U.S.C. § 1983

■ All parties apparently concede, and we agree, that the courts of this state have concurrent jurisdiction with federal courts over civil-rights actions filed pursuant to 42 U.S.C. § 1983. *See Endress v. Brookdale Community College,* 144 N.J.Super. 109, 364 A.2d 1080, 1092; and *McClanahan v. Cochise College,* 25 Ariz.App. 13, 540 P.2d 744, reh. den. 25 Ariz.App. 233, 542 P.2d 426. See, also *Brody v. Leamy,* 90 Misc.2d 1, 393 N.Y.S.2d 243, 247–257.

■ Albert contends, however, that since he had no statutory power to terminate the plaintiff, his conduct cannot come within the state action envisioned by 42 U.S.C. § 1983. At the root of Albert's argument is the belief that he is entitled to the defense, consisting of a qualified, good-faith immunity, announced in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214. Defendant Albert's contention is without merit to the extent that it emphasizes his statutory duties as definitive of the parameters of his liability. On the contrary, we find that § 1983 is concerned with the degree of participation in a deprivation of constitutional rights. An individual's status as a school superintendent does not, in itself, protect his or her activities in the context here considered. See, e. g., *Endress v. Brookdale Community College,* supra, at 1095; *Stoddard v. School District No. 1, Lincoln County, Wyoming,* D.Wyo., 429 F.Supp. 890, 894; *Aumiller v. University of Delaware,* D.Del., 434 F.Supp. 1273; and *Smith v. Losee,* 10 Cir., 485 F.2d 334, 344, cert. den. 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212.

■ We proceed, then, to the two pivotal issues with respect to the superintendent's liability under § 1983, which can be said to be:

absolute immunity for actions, taken pursuant to an official policy, resulting in a constitutional tort. *Monell v. Department of Social Services of the City of New York,* —— U.S. ——, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

1. Whether Albert's recommendation of termination was predicated, at least in part, on constitutionally impermissible reasons?
2. Whether Albert was entitled to the qualified, good-faith immunity defense?

We hold that the district court correctly answered the first question in the affirmative. The record clearly discloses evidence to the effect that plaintiff's alleged immorality was a significant reason for Albert's recommendation. As stated in *Stoddard v. School District No. 1*, supra:

" . . . The right to be free from unwarranted governmental intrusions into one's privacy is a fundamental constitutional right, *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and such right of privacy embraces the right of an individual to attend church or not, to determine his or her own physical proportions, and to determine with whom he or she will associate. . . . " 429 F.Supp., at 892.

The record is equally clear that the plaintiff's grading methods were seriously questioned by Albert, even though there was no grading policy or standards in the district. As succinctly stated by the district court:

" . . . Plaintiff could not constitutionally be terminated for use of a teaching method with which the superintendent disagreed, at least in the absence of clear prior warning that such a method was impermissible. *Keefe vs. Geanakos*, 418 F.2d 359, 362 (1st Cir. 1969); *Parducci vs. Ruckland, [Rutland]* 316 F.Supp. 352, 356 (Mid.Dis.Ala.1970); *Mailloux vs. Ki-*

*ley*, 323 F.Supp. 1387 (D.Mass.1971), affirmed 448 F.2d 1242 (1st Cir. 1971); *Webb vs. Lake Mills Community School District*, 344 F.Supp. 791 (N.D.Iowa 1972); *Sterzing vs. Ft. Bend Independent School District*, 376 F.Supp. 657 (S.D.Tex. 1972), affirmed 496 F.2d 92 (5th Cir. 1974); *Moore vs. Gaston County Board of Education*, 357 F.Supp. 1037, 1040 (W.D. North Carolina 1973)."

Turning to the so-called immorality issue, there is ample evidence in the record from which the court could have found that plaintiff's constitutionally protected conduct was a motivating factor in Albert's decision to recommend termination. Plaintiff, therefore, successfully carried his burden of showing that his conduct was constitutionally protected, and that such conduct was a "substantial factor" in Albert's recommendation. See, *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471. Given the lack of other sustainable reasons for Albert's recommendation of termination, we fail to see how Albert has sustained *his* burden of showing by a preponderance of the evidence that he would have reached the same decision concerning Holso's termination in the absence of the protected conduct—as required by the Mt. Healthy case. Even if such a showing had been made, it appears that only the scope of relief would have been affected[4]—and that aspect of the cause of action against Albert is not really a question.

 Secondly, we find that the district court's implicit rejection of Albert's

---

**4.** As stated in *Aumiller v. University of Delaware*, supra, at 1303:

"The existence of a collateral justification for defendants' actions possibly may be relevant to the *scope of relief* afforded to *Aumiller*, particularly regarding the appropriateness of reinstatement as a remedy. In *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court recently indicated that once a plaintiff has shown that his conduct was constitutionally protected and was a motivating factor in the defendants' decision not to rehire him, then defendants can limit plaintiff's remedy by demonstrating by a pre-

ponderance of the evidence that they would have reached the same decision even in the absence of the violation of the protected right. If this burden is satisfied, the Supreme Court indicated that the plaintiff would not be entitled to reinstatement as a remedy. The purpose of the remedy in such a context is to restore the plaintiff to the position he would have been in but for the constitutional violation, but not to place him in a better position than if no violation had occurred."

We agree with this interpretation of the *Mt. Healthy* decision.

defense of qualified, good-faith immunity was also correct. In order to qualify for this defense, Albert must demonstrate by a preponderance of the evidence (1) that he acted without malicious intention to deprive the plaintiff of his constitutional rights or cause him to suffer other injury, and (2) that he did not know and reasonably need not have known that his conduct violated the constitutional rights of the party affected. *Aumiller v. University of Delaware,* supra, at 1307, and *Skehan v. Board of Trustees of Bloomsburg State College,* 3 Cir., 538 F.2d 53, 60–62. U.S. cert. den. The district court expressly found actual malice to have existed in Albert's conduct—presumably based, at least in part, on his threat to the plaintiff. The record supports such a finding, thus precluding Albert's entitlement to the defense. See, *Smith v. Losee,* supra. Cf. *Vanderzanden v. Lowell School District No. 71,* D.Ore., 369 F.Supp. 67, 75. See, also, *Endress v. Brookdale Community College,* supra, at 1095. Albert knew, or should have known, that the action he took would cause a deprivation of plaintiff's constitutional right to privacy.

## DAMAGES AND ATTORNEY'S FEES

 Plaintiff had requested—in his action against Albert—compensatory damages for injury to his professional reputation and for pain and suffering as a result of defendant Albert's actions. There is little question that once a constitutional violation is made out under § 1983, a plaintiff may recover damages for emotional distress, embarrassment and humiliation. *Aumiller v. University of Delaware,* supra, at 1310; *Endress v. Brookdale Community College,* supra, at 1097–1098; and *Stoddard v. School District No. 1,* supra, at 892. In appropriate cases, punitive damages are also recoverable. See, *Silver v. Cormier,* 10

Cir., 529 F.2d 161, 163–164; and *Smith v. Losee,* supra. In order to recover such damages, the plaintiff need only show (1) that he in fact suffered such damages; and (2) that defendant's actions proximately caused plaintiff's injury. *Aumiller v. University of Delaware,* supra. There is adequate evidence in the record to support plaintiff's allegations that his opportunities to pursue his career have been substantially reduced and his confidence and relationships with others within and without the school district have been affected by reason of Albert's actions. We hold that the district court's judgment against defendant Albert, in the amount of $2,500.00, should be affirmed. Since we find no liability on the part of the Board, we reverse the judgment, in the amount of $5,000.00, against its members in their official capacity.

 Finally, plaintiff sought and recovered attorney's fees against Albert, pursuant to 42 U.S.C.A. § 1988, as amended [5], in the amount of $2,172.55. The federal act, known as the Civil Rights Attorney's Fees Awards Act of 1976, makes the award of fees discretionary, and has been applied retroactively to § 1983 cases pending at the time of its enactment. See, e. g., *Rainey v. Jackson State College,* 5 Cir., 551 F.2d 672. The district court did not abuse its discretion in making this award—particularly in light of the fact that the parties stipulated that a reasonable attorney's fee for the entire case would be $4,345.10. We will, therefore, affirm the attorney's fee award against Albert. For the reasons previously stated herein, the award of attorney's fees as punitive damages against the Board is reversed.

Affirmed in part and reversed in part, and remanded to the trial court for entry of

---

5. 42 U.S.C. § 1988, as amended, provides in pertinent part:

"... In any action or proceeding to enforce a provision of sections 1977, 1978, 1980, and 1981 of the Revised Statutes [42 USCS §§ 1981–1983, 1985, 1986], title IX of Public Law 92–318 [20 USCS §§ 1681 et seq.], or in any civil action or proceeding, by or on behalf of the United States of America,

to enforce, or charging a violation of, a provision of the United States Internal Revenue Code [26 USCS §§ 1 et seq.], or title VI of the Civil Rights Act of 1964 [42 USCS §§ 2000d et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 USCS § 1988, 1977, Cum. Supp.

judgment which is consistent with this opinion.

RAPER, Justice, with whom THOMAS, Justice, joins, concurring in part and dissenting in part.

I concur in affirmance of the district court's judgment reinstating the plaintiff and awarding him back pay and fringe benefits lost. I also concur in reversal of the district court's finding of liability and judgment against the board of trustees, awarding damages of $5,000.00 for a claimed tort along with attorney fees of $2,172.55, as punitive damages. In the reversal aspect, I concur for different reasons than those set out in the major opinion, with which I disagree. I dissent as to the affirmance of the district court's finding of liability and award of $2,500.00 compensatory damages, along with the attorney's fees of $2,172.55 as punitive damages, against the school superintendent, Albert. I join in the dissent of Justice Thomas. Such a precedent set by the majority is insidious in its inequity of holding a school administrator solely and personally liable for grounds of discharge or termination of a school teacher when the school board is the only body having authority to discharge or terminate and it, after due process proceedings, made the decision of termination.

There is no need to apply any exception to relief under the tort rule with respect to "interference with prospective advantage" as ground for relieving the school board of liability; that point should not be reached. The school board has total immunity under state law in the type action filed against it. The board members, as the alter ego of the school district, have as a governing body, immunity when sued as here, in their official capacities and not individually. Section 1-35-102, W.S.1977, provides:

"The defense of governmental immunity shall be waived to the extent of the limits of liability insurance carried by the governmental entity. This section applies to any governmental body or agency in the state securing liability insurance coverage."

In this case there was no insurance covering the tort claimed. School districts have only been authorized to carry liability insurance on motor vehicles, § 21-3-126, W.S.1977, and against bodily injury or death in other cases, §§ 21-3-128 and 21-3-129, W.S.1977. Those statutory sections provide, either directly or indirectly, that if such insurance had not been obtained, the provisions were not intended to create any liability upon school districts. Such provisions are consistent with the rulings of this court in *Collins v. Memorial Hospital of Sheridan County*, Wyo.1974, 521 P.2d 1339, and *Fagan v. Summers*, Wyo.1972, 498 P.2d 1227, holding tort liability to exist only to the extent of insurance coverage.

I am satisfied that the decision of the court has taken away from the administration of schools in this state a necessary element of flexibility in the exercise of official discretion in management. By placing the entire burden of the plaintiff's termination on the superintendent of schools, Albert, and holding him personally liable, he and others similarly situated will, in all likelihood, no longer be able to fully serve the interests of the public. Under the pressure of risks of money judgments against them, personally, to be paid from their own pocketbooks, they will simply not recommend termination, regardless of their good faith belief that some persons should no longer be retained on a school faculty. I consider it significant that the trial judge found neither bad faith nor malice on the superintendent's part but did find that the board of trustees acted "knowingly, intentionally, and maliciously" in its discharge of the plaintiff. (I disagree with that finding as to the board because of the absence of any evidence to support it but we need not reach that point because of reversal of the judgment against the board.) Just as Judge Barrett said in his dissent in *Smith v. Losee*, 10 Cir. 1973, 485 F.2d 334, cert. den. 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212, a case involving school administrators who recommend a denial of tenure, "I simply cannot be a party to such a result."

I find some of the thoughts just expressed echoed in *Wood v. Strickland,* 1975, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, reh. den. 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790, decided after *Smith v. Losee,* supra, where it was claimed that school administrators acted unconstitutionally toward students in violation of § 1983. While I am convinced that the United States Supreme Court still left not clearly defined the exterior boundaries of official immunity, its pronouncements in that case protect the defendant, Albert, in this case. The Court acknowledged that strong public policy reasons dictate that school administrators should have some protection from tort liability. That case reasoned the liability for every action found subsequently to have been violative of constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith during the course of exercising discretion within the scope of his official duties. Denying a measure of immunity would contribute not to principled and fearless decision making but to intimidation. The Court in *Wood* recognized that imposition of monetary costs for errors that were not unreasonable in the light of all circumstances would deter even the most conscientious decisionmaker from independently expressing his judgment forcefully, and in a manner best serving the long-term interests of the school and the students. As for the *Wood* Court's objective, its announced aim was to grant an immunity which school officials would understand; that good faith action, taken in the fulfillment of their responsibilities within the bounds of reason under the circumstances, will not be punished and they need not exercise their discretion with undue timidity. The Court then went on to quote from *Scheuer v. Rhodes,* 1974, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90:

"" '* * * Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and

possible injury from such error than not to decide or act at all.' *Scheuer v. Rhodes,* 416 U.S. at 241–242, 94 S.Ct., at 1689 [40 L.Ed.2d 90] (footnote omitted)."

The *Wood* case then went on to establish a rather indistinct standard but one which nevertheless shields Albert. A school official must act sincerely with a belief he is doing right but at the same time his act cannot be justified by ignorance or disregard of settled indisputable constitutional rights or by the presence of actual malice.

The first so-called constitutional violation raised here does not in fact exist. The charges, signed by Albert, filed against the plaintiff, recommending dismissal, did not even allege immorality on the part of plaintiff as a ground. The board's order of termination did not recite that reason as a ground for termination though it was brought out during the course of the administrative hearing. The board's order in that regard was as follows:

"4—On April 3, 1975, David E. Holso spent the major part of the 3rd, 4th, 5th and 6th period classes talking to his students in those classes about the specific grounds for his termination. The discussions were initiated by him and were not initiated by questions from the students. In his second period class he also initiated the discussion but spent less time talking about the matter. On April 3, 1975, although no specific charge of immorality had been made in the notice of termination, he injected that problem into the discussion he initiated with the students."

My reconstruction of the record from both the administrative proceedings and the trial transcript leads me to the conclusion that any suggestion of immorality by Holso arose from within the board itself because of complaints from members of the public. At a board meeting prior to initiation of the termination proceedings, a member of the board of trustees asked the others, referring to the apparent close relationship between the plaintiff and a female teacher, "[H]ow do you explain to your daughter when she comes home and asks about a situation like this."

The quoted part of the preceding paragraph was brought out during the voir dire of the board by plaintiff's counsel, before commencement of the administrative hearing. There is no evidence whatsoever that any question of Holso's immorality was initiated by the defendant Albert. He did testify at the administrative hearing that he had seen Holso's car parked overnight at the home of the female teacher. Prior to the hearing, he had never so advised the board. At the trial, the member of the school board first raising the question, testified more to the point:

"I said, if an unmarried female teacher and an unmarried male teacher are supposedly sleeping together, and your daughter asks about it, how do you explain it?"

Neither the students nor the public knew that Holso's behavior and association with Miss Brookover was in fact innocent; that they had stayed with a married couple on their trip. By his own admissions, his car was parked overnight at Miss Brookover's on quite a number of occasions. One student, called by Holso, said he told them, "Well, that they were just staying together or something." Defendant's counsel did not do too well straightening that out with his leading question that the witness did not mean that, the response being "Huh-uh."

Not one witness testified that the defendant Albert stirred up immorality as a ground for termination. Although there is no question but that he thought morality was an important professional attribute in a teacher's position and that any suggestion of immorality was damaging to a school, its educational standards and students. He was not mistaken in his view of significance. This court has said so, as had other authority.

In *Tracy v. School District No. 22, Sheridan County, Wyo.,* 1952, 70 Wyo. 1, 243 P.2d 932, reh. den. 247 P.2d 153, quoting from *Baird v. School Dist. No. 25, Fremont County,* 1930, 41 Wyo. 451, 472, 287 P. 308, 315, this court recognized the responsibility of a teacher:

" 'It was said in *City of Crawfordsville v. Hays,* 42 Ind. 200, that a teacher agrees "by necessary implication, that while he continues in such employment, his moral conduct shall be in all respects exemplary and beyond just reproach." And not merely good character, but also a good reputation is essential to the greatest usefulness in such a position. *Freeman v. Inhabitants of Bourne,* 170 Mass. 289, 49 N.E. 435, 39 L.R.A. 510. Intrusted as the teacher is with the education of the young, it becomes of primary importance that the principles of right living be by him instilled into them by his example and by his conduct.' "

That policy of this court was once again summarized in *Jergeson v. Board of Trustees of School District No. 7, Sheridan County,* Wyo.1970, 476 P.2d 481, 487, as follows:

"* * * [A] teacher agrees by necessary implication that while he continues in his employment his moral conduct shall be in all respects exemplary and beyond just reproach; that entrusted as the teacher is with the education of the young, it becomes of primary importance that the principles of right living be by him instilled into them by his example and by his conduct."

In the last cited case this court quoted favorably from Hamilton and Mort, The Law and Public Education, 1941, pp. 358–359:

"The peculiar relationship between the teacher and his pupils is such that it is highly important that the character of the teacher be above reproach. It is well settled, therefore, that a teacher may be dismissed for immorality or misconduct. The Court of Appeals of Kentucky has said that both parents and pupils regard the teacher as an exemplar whose conduct might be followed by his pupils, and the law by necessary intendment demands that he should not engage in conduct which would invite criticism and suspicions of immorality. Even charges of or reputation for immorality, although not supported by full proof, might in some cases, be sufficient ground for re-

moval. Not merely good character but good reputation is essential to the greatest usefulness of the teacher in the schools. For example, the indictment of a superintendent of schools for adultery, followed by conviction, is sufficient grounds for his dismissal even though the conviction is subsequently set aside. It requires no extended argument to convince one that a teacher upon whom rests a well grounded suspicion of immorality cannot be an effective teacher of public school pupils. The board is not bound to form a judgment as to the truth or falsity of the charges." (Footnotes omitted.)[1] See also *Durst v. School District No. 2 of Niobrara County,* 1929, 39 Wyo. 442, 449, 273 P. 675, 678.

The majority has now abandoned those worthwhile concepts and relegated a teacher's conduct outside the schoolhouse to his own private business, when it sets out the holding of this court to be the following:

> " 'The right to be free from unwarranted governmental intrusions into one's privacy is a fundamental constitutional right, *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and such right of privacy embraces the right of an individual to attend church or not, to determine his or her own physical proportions, and to determine with whom he or she will associate.' "

*Stoddard v. School District No. 1, Lincoln County, Wyoming,* U.S.D.C.Wyo.1977, 429 F.Supp. 890, from which the foregoing quotation was taken, did not involve a question of teacher immorality. *Stanley v. Georgia,* cited within the quotation, involved the constitutionality of an obscenity statute in which the defendant, not a school teacher, was charged with the crime of possession of an obscene film and the court merely held that the State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch.

I cannot see that plaintiff's conduct is constitutionally protected on the basis of any authority cited. I can find no law or case which holds that a school teacher has a constitutional right to be immoral or give the appearance of immorality. If there is such a right, it is in the case of a school teacher subordinate to the public interest.

*Wishart v. McDonald,* 1 Cir. 1972, 500 F.2d 1110, is illustrative of the usual court attitude toward the limits of privacy. In that § 1983 proceeding a school teacher had been discharged for conduct unbecoming a teacher. The conduct by a small-town teacher was carried on in public view on his property, located in the town where he taught. He took a mannequin he had constructed, draped in a negligee, into his front yard where in a lewd and suggestive manner he had dressed, undressed and caressed it. The teacher claimed the school committee was punishing him for constitutionally protected private conduct and that the reason was unrelated to the educational process or to the working relationship within the educational institution. The court disagreed and held that the conduct would serve as a role-model for young children and his image as a school teacher gravely jeopardized.

In *Sullivan v. Meade County Independent School District No. 101,* U.S.D.C., S.D.1975, 387 F.Supp. 1237, aff'd cause remanded for dismissal 530 F.2d 799, it was held that discharge of a teacher for her conduct in living with a boyfriend without benefit of matrimony was not unrelated to the educational process or to working relationships within the educational institution, where there was strong community reaction. The plaintiff claimed that her relationship with the boyfriend was constitutionally protected within the meaning of the right to privacy. The court held that such a right of privacy

---

1. One of the authors, Robert R. Hamilton, was Dean of the Law School, University of Wyoming, for many years. He is a recognized authority on school law. The cited book came out as a Second Edition in 1959; the same statement appears at page 397 thereof. Dean Hamilton also authored Legal Rights and Remedies of Teachers, 1956; at pp. 46–47, the same theme is discussed and made clear that a higher standard of conduct is required of teachers than others.

is not present because a school board may legitimately inquire into the integrity of its teachers. Immoral conduct sets a bad example for the young, impressionable people being taught.

The federal courts have repeatedly held that a state has a vital concern in the integrity of its schools and school authorities have a right and duty to screen officials, teachers and employees as to their fitness to maintain the integrity of the schools. *Beilan v. Board of Public Education, School District of Philadelphia,* 1958, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414, cert. den. 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 91; *Adler v. Board of Education of City of New York,* 1952, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517, 27 A.L.R.2d 472; *Jenkyns v. Board of Education of District of Columbia,* D.C. Cir. 1961, 111 U.S.App. D.C. 64, 294 F.2d 260; *James v. West Virginia Board of Regents,* U.S.D.C., S.D.W. Va.1971, 322 F.Supp. 217, aff'd 448 F.2d 785.

In *Beilan* the Supreme Court of the United States approved the utterances of the Supreme Court of Pennsylvania in *Horosko v. Mt. Pleasant Twp. School District,* 1939, 335 Pa. 369, 6 A.2d 866, stated when speaking of immorality as inconsistent with moral rectitude:

" 'If the fact be that she "now commands neither the respect nor the good will of the community" and if the record shows that effect to be the result of her conduct within the clause quoted, it will be conclusive evidence of incompetency. It has always been the recognized duty of the teacher to conduct himself in such way as to command the respect and good will of the community, though one result of the choice of a teacher's vocation may be to deprive him of the same freedom of action enjoyed by persons in other vocations. Educators have always regarded the example set by the teacher as of great importance * * *.' "

The court in the case before us would now grant full freedom of immoral conduct to teachers and repeal, as to conduct off the school grounds, the immorality provision of § 21–7–110(a), W.S.1977:

"(a) The board may suspend or dismiss any teacher for incompetency, neglect of duty, *immorality,* insubordination, or any other good or just cause. (Emphasis added.)

That Albert was in good faith is evidenced by his conference with the school attorney, whose opinion was sought before ever giving notice of termination. He was advised there were sufficient grounds to pursue termination. Counsel so testified at the trial. One who takes the advice of counsel before instituting a criminal prosecution, and who places before such counsel all the facts and who acts in good faith on the opinion of counsel, has probable cause, and is not liable in an action for malicious prosecution. *Boyer v. Bugher,* 1911, 19 Wyo. 463, 120 P. 171. Certainly if that is evidence of good faith when initiating a criminal prosecution, it ought to be in a civil case, as well. I consider good cause to be as defined in *Wood v. Strickland,* supra.

The matter of morality here was taken up with counsel. Albert indicated there had been some complaints about Holso being seen as much as he was with Miss Brookover. Gregson, the school principal, said they had gone hunting together. Counsel advised that the evidence to support such ground was rather weak, so for that reason was never charged. It was therefore concluded, upon recommendation of counsel that the morality question would not be pursued and was not, other than in the finding and conclusion of the board that it was not a matter which a teacher should take up with his students, on school time. Members of the board in their testimony at the trial stated that the plaintiff ought to be teaching and not use his time taking up his personal problems with his students, an action about which parents had complained to the board.

At trial, one of four members of the board of trustees, called by the plaintiff as a witness, testified that any question of the morality of the plaintiff played no part on the board's decision to terminate plaintiff. A study of the transcript of the administra-

tive hearing and trial discloses that any question of plaintiff's morality originated within the board itself and not with the defendant-superintendent of schools. The overwhelming *evidence*, with none to the contrary, is that immorality was not formally charged, not considered and not found to be any basis for the plaintiff's-teacher's termination. The plaintiff has dragged that question in as nothing more than a red herring, as some perfidious, secret reason for the plaintiff's termination.

With respect to plaintiff's harsh grading system, I find no case which considers grading in whatever method the teacher's whims and fancy lead him as a protected constitutional right. That is fallacious on its very face. Contrary to the statement of the majority that the plaintiff had no notice of any school standard, the evidence was that the probability curve was basic elementary instruction to all teachers and well known within the profession. In addition, every teacher in the Weston County school system was issued a standard "Class Record Book" published by School Form and Supply Company, received as an exhibit, which contained the following table of suggested marking systems:

| | MEANS OF EXPRESSING MARKS | | | PERCENT OF PUPILS | |
|---|---|---|---|---|---|
| Quality | Letter System | Numerical Value * | Percentage | Normal Distribution | Possible Variation |
| Excellent | A | 5 | 94 to 100 | 7 | 0 to 15 |
| Good | B | 4 | 87 to 93 | 24 | 15 to 30 |
| Average | C | 3 | 80 to 86 | 38 | 30 to 50 |
| Pass | D | 2 | 75 to 79 | 24 | 15 to 30 |
| Fail | F | 1 | Below 75 | 7 | 0 to 15 |

* For daily marks

The only variation from the table appears in the school regulations fixing "Fail" at 70, rather than 75. The plaintiff's grading varied to a considerable extent in an inordinate number of "D's" and failures, causing many complaints to the school board by parents and students of Holso's classes, complaints not registered with respect to the classes of other teachers within the system.

The majority classifies the complete exemption from control in the area of grading as "academic freedom." That is an utter distortion of the term and its application. The term refers to the text and manner of teaching. Not one single case cited in the majority opinion dealt with grading as a protected constitutional right but related to subjects and methods covering vulgarity, literary garbage, the popular synonym for sexual intercourse, use of profanity and drinking in school plays, race and prejudice in interracial marriage and personal agnosticism. It will probably come as a tremendous surprise to the teaching profession, lawyers, scholars, parents and children that teachers have a complete license to flunk students willy-nilly because the Constitution says they can. Members of the board testifying at trial stated that the most common complaint against Holso, heard for four or five years and upon which they received rumbles from parents, was on his grading system.

It must be realized that a board of trustees is elected by the people of the district to represent them in school matters. When there are complaints to be made or questions to be asked by parents and others, the trustees are contacted. At least three matters that were involved in this case arose within the board in that fashion. The plaintiff's grading system was the subject of the most complaints to the board from parents. The question of Holso's discussion of his personal problem, particularly his extracurricular association with a female teacher, arose by a conveying of that information by students to their parents and thence to the board. The child of one school board member was a student in one of the classes of Holso, in which the matter was discussed. The school board member arranged to have his child taken from the

class because of any possible effect upon the proceedings. Finally, the matter of Holso's morality arose by contacts with the board, from students and the public, not from the school superintendent.

The *only* testimony that places the blame for the plaintiff's troubles on the defendant Albert came from the plaintiff himself. The plaintiff testified he believed the superintendent was responsible for all his troubles because "I received the letter by the undersheriff, I believe the term is, and he said Mr. Albert had directed him to deliver the letter to me, and Mr. Albert's signature was on the letter." The superintendent serves only in a ministerial capacity when he initiates a proceeding for suspension, dismissal or termination of a teacher. Section 21.1–160(a), W.S.1957, 1975 Cum. Supp. [§ 21–7–110(a), W.S.1977], provides:

"(a) *Written notice.*—Suspension or dismissal proceedings *shall be initiated* by the superintendent or any member of the board delivering to the teacher a written notice thereof, together with written reasons therefor." (Emphasis added.)

Section 21.1–156(a), W.S.1957, 1975 Cum. Supp. [§ 21–7–106(a), W.S.1977], provides:

"(a) A continuing contract teacher shall be notified of a recommendation of termination by the superintendent or any member of the board by giving such teacher written notice thereof, together with written reasons therefor on or before March 15 of any year."

The fact that the superintendent or a board member signs a notice has no connotations of malice or bad faith any more than a prosecuting attorney signing a criminal complaint or criminal information or the foreman of a grand jury signing an indictment. One cannot just manufacture a constitutional violation and infer malice from the fact that the superintendent is required by statute to sign a notice of termination. If that is to be the law, then a superintendent is helpless to perform his duty.

The majority is placing the entire impact on its decision on a superintendent who had no authority to terminate Holso. Only the school board had the statutory authority to terminate the teacher. He was, in fact, terminated by the board, not the superintendent. Albert's signing of the notice was not even a recommendation yet even if it was, it could not deprive the plaintiff of any right, privilege or immunity secured to him by the Constitution and laws of the United States. In a like case, it was held a teacher is not entitled to relief against the superintendent of the school district for that reason. *Vandersanden v. Lowell School District No. 71,* U.S.D.C., D.Or.1973, 369 F.Supp. 67.

When asked at the trial of the case before us on cross-examination why he thought the board was malicious, the plaintiff teacher replied:

"I believe the school board intended—the school board and the superintendent intended to do me harm, because they were unhappy with my individualism as a man. They were unhappy with me as a person. And, they thought, we gave you an offer to quietly resign and get out, and you challenge us now we're going to put you in your place."

The majority points to the following testimony of the plaintiff to show bad faith and malice of the defendant: "he [Albert] made references to the fact that when this is completed, you won't be getting a job. You will be lucky if you get—you will not get a job any place." In the first place, there is no corroboration of that statement, though it seems to have been purportedly made during a conference when Gregson, the school principal, was present; he did not remember. The defendant-superintendent Albert denies the statement. In the second place, I construe that to be more or less a statement of a fact of life. I rather suspect that a school board or school superintendent might be hesitant about a teacher who has been through a termination proceeding. Thirdly, there is no evidence that the superintendent or anyone else took any further action to blacklist the plaintiff at any place or time or under any circumstances. I will discuss this later as related to damages.

The first point I have made with respect to the two foregoing supposedly constitu-

tional grounds (immorality and grades) is that there was board basis for its dissatisfaction with Holso in those areas. More than that, however, there was basis for the other grounds for termination and their cumulative effect points to a teacher that a school board could reasonably believe was inadequate and not in the best interests of the school district to retain. I want to briefly mention those other grounds.

The majority places its principal reliance upon the fact that plaintiff did not exceed his sick leave and anything else was trivial. That is an understatement of the facts. It is regrettable that Mr. Holso is afflicted as he is with a "severe" case of diabetes and the disabilities associated with a colonectomy.[2] On at least two occasions during classroom periods, he had attacks of hypoglycemia, too low a blood sugar content, causing him to go into a coma. As a result, it was necessary that students run to the school office for help. As a matter of fact, the administrative hearing was delayed because Holso developed hypoglycemia and had to be taken to the hospital where he was admitted to the emergency room in a semicomatose state and beginning to have mild convulsive seizures.

With respect to the ileostomy, special attention must be given to body evacuation. According to plaintiff's own testimony, it is not a matter that can wait and he frequently must leave the classroom to dispose of waste. That may require anywhere from an average 5–10 minutes to 20 minutes. It was not that school authorities were intolerant or insensitive to Mr. Holso's health problems. He was assigned to a classroom very near the school office and instructed to notify someone there that his class was unattended, when necessary to relieve him-

self. That is what he failed to do. The finding of the board very well summarizes the difficulty and it has factual basis.[3]

In *Fisher v. Church of St. Mary,* Wyo. 1972, 497 P.2d 882, this court held that contracts to perform personal services are made on the implied condition that the party employed shall be capable of performing the contract, so that a disability caused by physical condition will operate as a discharge, termination of the contract or excuse for nonperformance. The court went on to hold that such a disability must be material and an illness of long duration, which renders an employee unable to substantially perform, thus permitting the employer to treat the agreement as terminated. The significant holding of this court, however, is that whether justification exists for termination of a contract under the facts and circumstances of a particular case is usually *a question of fact for the fact finder.*

In the *Church of St. Mary* case, this court held that a disability of long duration, causing serious inconvenience or injury to the church school was sufficient reason for termination of the teacher's contract. In the case before us, the fact finder is the school board created to find those facts and make that decision. While I might have a different view, reasonable minds can differ as to whether Holso's permanent physical condition materially interfered with the substantial performance of his contract. There was something more than a scintilla of evidence to support the board's decision and it was of such relevance that a reasonable mind might accept it as adequate to support a conclusion. That is all that is required. *Howard v. Lindmier,* 1950, 67 Wyo. 78, 87, 214 P.2d 737, 740. It is not the

---

**2.** The entire colon is removed surgically and the small intestine is brought out through the abdomen in what is called an ileostomy. The latter procedure requires that a small plastic bag be attached to the skin in order to allow the patient to eliminate body waste.

**3.** "1—The illnesses of David E. Holso (diabetes and ileostomy) interfere with his professional responsibility in the classroom and cause him to be absent from classes for substantial peri-

ods of time. On the occasions of his absences, he has failed to notify the principal's office and the absences result in inattention to school work by the students. Mr. Holso has not carefully observed his diet and has on occasion not carefully controlled his diabetic condition. Mr. Holso failed to follow the direction of the principal that he notify the principal's office each time he found it necessary to leave his room during a class period."

business of this court to substitute our judgment for that of the school board. *Shenefield v. Sheridan County School District No. 1,* Wyo.1976, 544 P.2d 870, and the cases there collected. See also *Baird v. School Dist. No. 25, Fremont County, supra.*

There was also a factual basis within plaintiff's failure to perform work assigned by his superior:

"2—Mr. Holso failed to complete and hand in specific assignment of work required by his superior, Mrs. Betty Shurley. He was reminded to do so on several occasions at meetings by Mrs. Shurley and his principal, Glenn Gregson. The assignment was the preparation of a class outline or syllabus which was to be a significant part of a booklet designed to coordinate the curriculum of English classes from kindergarten through 12th grade in Newcastle schools. Mr. Holso did not complete or hand in this work until six days after his notice of termination was given and after the booklet was assembled without his work. Mr. Holso admitted that he failed to cooperate with the head of the English department and failed to hold a high school English teachers meeting that he was directed to hold. The failure to hold the meeting was not excused by any facts shown."

I have no argument with the majority's statement of the rule that in order to be a ground for discharge, insubordination must be of a continuing nature—"a persistent course of willful defiance." However, in this case, it adds fuel to the fire of dissatisfaction of the school board with this particular teacher. It adds credence and support to the board's participation in proceeding toward his removal for the good of the school system concerned.

Within the ambit of *Wood v. Strickland, supra,* the school board had good cause as did the superintendent to move toward the removal of Holso. In *Prebble v. Brodrick,* 10 Cir. 1976, 535 F.2d 605, a University of Wyoming teacher case, the court recognized *Wood* and summarized the rule of that case as follows:

"* * * The Court ruled that a school board member is not immune from damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student, or if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury to the student; a compensatory award is appropriate only if he acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. *Id.* at 322, 95 S.Ct. at 1000–01, 43 L.Ed.2d at 225."

The Tenth Circuit then proceeded to apply it to a teacher case and affirmed the discharge. *Wood* applies to school authorities other than the board of trustees. There is in the case before us no impermissible motivation nor such clearly established constitutional rights that either the action of the board or the superintendent cannot reasonably be characterized as being in good faith.

The plaintiff in all three causes of the complaint as amended charged that the board of trustees and the superintendent acted "jointly and severally" in not only a constitutionally prohibited discharge under 42 U.S.C. § 1983 but also under the tort concept by which the majority relieves the board of trustees of liability. The trial judge in his form of judgment also held against the superintendent not only under § 1983 but also on the tort approach. It is my view that there is not only no § 1983 claim but also none for the tort, "malicious interference with opportunity to pursue his professional career", or "interference with prospective advantage" as labeled by the majority. If the court is going to apply that doctrine, then we must also examine it as to the defendant Albert. As pointed out previously, the trial judge in that phase found the school board malicious but failed to find the superintendent malicious. If the application of that rule is not discussed, there will be left the appearance of and tacit approval by this court of an inapplicable doctrine erroneously applied.

As I see the majority opinion, the tort rule it applies is taken from § 766, p. 49, Restatement of the Law of Torts (1939):

"* * * [O]ne who, *without a privilege to do so*, induces or otherwise purposely causes a third person not to

"(a) perform a contract with another, or

"(b) enter into or continue a business relation with another

"is liable to the other for the harm caused · thereby." (Emphasis added.)

The words, "without a privilege to do so" means that it applies to outsiders. Albert is not an outsider but one charged with an efficient operation of the district's school system. He is no more a stranger than the school board. It is within the scope of his duties to recommend termination of a teacher's contract and he must be given some latitude in doing so. He falls within the privilege provisions of subsequent sections of the Restatement of the Law of Torts, §§ 770, pp. 81–82, and 772, pp. 85–87. In *Wartensleben v. Willey,* Wyo.1966, 415 P.2d 613, this court recognized the element of privilege to purposely cause another not to perform a contract.

I have searched the available references and have not found where the tort theory advanced by the plaintiff and the trial court has been generally utilized in connection with the termination or discharge of public employees. There are literally hundreds and hundreds of reported cases on the subject of liability for procuring breach of contract. See the comprehensive annotation on the subject in 26 A.L.R.2d 1227 and equally imposing array of cited cases in the Later Case Service, with pocket supplement, to that annotation; supplements to Restatement of the Law of Torts; Torts, West's Digest System, Key No. 12.

I found four cases which could be identified by title or case notes applicable to school teachers and none are favorable to plaintiff. *Widger v. Central School District No. 1 of Towns of Ellicottville, Great Valley, East Otto, Franklinville, Humphrey and Mansfield, Cattaraugus County,* 1964, 20 A.D.2d 296, 247 N.Y.S.2d 364, dealt with

a cause of action for tortious intervention with contract rights. The court stated the general rule to be that one acting within the scope of his employment, who induces a breach of contract, is not liable in damages to the other party to the contract. The court cited *Greyhound Corporation v. Commercial Casualty Ins. Co.,* 1940, 259 A.D. 317, 19 N.Y.S.2d 239, cited in the A.L.R.2d annotation, 26 A.L.R.2d 1270, as standing for the general rule that officers, directors or employees of a corporation are not liable for a breach of the corporation's contract on the theory that they induced such breach. It is noted in that annotation as a reason that it would be anomalous indeed to hold an agent liable for a tort committed within the scope of his authority when liability does not attach to the principal for the same tort committed on his behalf and presumably for his benefit.

Another case is *Caverno v. Fellows,* 1938, 300 Mass. 331, 15 N.E.2d 483. In that decision the teacher, as plaintiff, had difficulty with the school principal over failure to furnish school news material to the local newspaper. Her immediate teacher supervisor, the principal, was defendant. The principal became angry and said he would see to it that plaintiff would live in some other place, indicating discharge. The plaintiff testified further that the principal said to her, "I shall see whether Miss Harris and I, or you will remain longer in the Gloucester High School." The matter was reported to the superintendent, who recommended to the school committee (equivalent of a board of trustees) that because of that and the plaintiff's nervous condition, she be terminated.

The court in *Caverno* pointed out that when malice or malevolence is the only reason for the action and there is no other justifiable purpose, it must be answered for. However, the court pointed out that the evidence did not show that the malevolence, rather than a purpose to perform a duty, was the defendant's sole or even dominant purpose in the actions taken toward dismissal of the plaintiff. The court concluded that statements made to the plaintiff were

not sufficient to show unlawful interference. Generally, the case holds the actions taken by the teacher's immediate supervisor, the principal or superintendent, were actuated by no more than a desire to promote the interests of the school and were not actuated by ill will or a purpose to harm the teacher. I consider the superintendent's position in the case before us to be identical to the position of the superintendent in *Caverno* in which it was noted that the superintendent was following normal statutory provisions for proceedings against the teacher, leading to her dismissal, and that he was doing no more than performing his duty as superintendent to properly promote the interests of the school.

A third case found is *Bullock v. Joint Class "A" School District, No. 241, Idaho, Adams and Lewis Counties,* 75 Idaho 304, 272 P.2d 292. There the teacher refused to be transferred to another school so was discharged by the trustees, upon recommendation of the district superintendent. The plaintiff complained that the superintendent threatened to harm her teaching certificate and see that she never taught in the state again if she refused to accept a transfer. The court held there to be no cause of action in tort against the superintendent, in the absence of any acts or things done by him or the trustees to carry out the threat, with resulting injury to the plaintiff. The court further held that the superintendent was acting in his official capacity, within his authority and with full approval of the board, nor did he do any wrongful or illegal act in order to accomplish the termination of the contract. The threats were considered wholly extraneous matter.

The plaintiff's claim of tortious interference with his contract has been judicially considered yet more recently. In a similar case, *Perry v. Apache Junction Elementary School District, # 43,* 1973, 20 Ariz.App. 561, 514 P.2d 514, pet. rev. den. 111 Ariz. 1, 522 P.2d 761, a discharged school principal charged that members of the school board and superintendent had conspired to bring about the wrongful termination of her employment. Affirming dismissal of the claim on motion for summary judgment, the Arizona court said:

"We must now consider the conspiracy to procure appellant's breach of contract. A school board member is an agent of the school board, *Webster v. Heywood,* 21 Ariz. 550, 192 P. 1069 (1920), and the superintendent is obviously an employee of the board. It has been held that agents and employees of a corporation cannot conspire with their corporate principal or employer when acting in their official capacities on behalf of the corporation and not as individuals for their individual advantage. *Wise v. Southern Pacific Company,* 223 Cal.App.2d 50, 35 Cal.Rptr. 652 (1963).

"We think the rule expressed by the California court is applicable here. Being in a confidential relationship with the board the actions of the members and the superintendent were privileged. *Wise v. Southern Pacific Company,* supra. We can find no facts alleged indicating that appellees were acting for their individual advantage."

The holdings of *Caverno* and *Bullock* are consistent with the holdings of this court with respect to malice as a motivating factor. *The want of probable cause may not be inferred from malice. Steadman v. Topham,* 1959, 80 Wyo. 63, 338 P.2d 820; *Henning v. Miller,* 1932, 44 Wyo. 114, 8 P.2d 825, reh. den. 44 Wyo. 114, 14 P.2d 437; *McIntosh v. Wales,* 1913, 21 Wyo. 397, 134 P. 274, Ann.Cas. 1916C 273; *Boyer v. Bugher,* supra. Even though used in malicious prosecution cases, that statement of reason and logic is applicable in the case before us where the plaintiff, with the approval of the majority, seeks to punish the defendant for giving him notice of termination.

Even assuming that Albert's statement to Holso that he would find some difficulty finding a job after these proceedings was a threat and some indication of malice, which I disclaim to be the case, probable cause existed for instituting the termination proceeding, as in this opinion demonstrated.

Since I find no basis for a holding favorable to plaintiff, I would allow no damages

beyond those to restore him his lost salary and fringe benefits. Even if plaintiff were to be allowed recovery of something beyond that, it could be no more than nominal. He proved no actual damages for any asserted constitutional violations, other than the cost of phone calls made after termination by the board. There was no evidence whatsoever that any member of the board of the defendant Albert made any adverse report or recommendation to any prospective employer or that any prospective employer turned down the plaintiff because of his termination by the board. Nor is there any evidence that the defendant Albert circulated word to anybody that plaintiff should not be employed or that he made any active effort whatsoever to impugn the plaintiff. Plaintiff is still on the job; he can have no loss for any future employment disadvantage!

The holding of the court in this case establishes a system of rewards for the unsatisfactory teacher to be paid as a penalty personally by the school superintendent. If he attempts to upgrade the professional teaching staff of the school under his management and a court decides the evidence is insufficient, though present, he is at once charged with malice and a violation of the teacher's constitutional rights and malice, stripped of his discretionary authority and exposed to a personal money judgment. Courts do not hold an unsuccessful plaintiff liable for failing to prove his case, so I see no reason to do so where the eventual outcome of an administrative proceeding results in its reversal.

Words spoken during the course of judicial proceedings have historically been privileged. In *School District No. 11, Laramie County v. Donahue,* 1940, 55 Wyo. 220, 97 P.2d 663, the defendant sought damages against the plaintiff because in the pleadings it was alleged that the defendant was insolvent, and thus libeled. This court approved the following language:

> " 'Then we take the rule to be well settled by the authorities, that words spoken in the course of judicial proceedings, though they are such as impute crime to another, and therefore if spoken elsewhere, would import malice and be actionable in themselves, are not actionable, if they are applicable and pertinent to the subject of inquiry. The question, therefore, in such cases is not whether the words spoken are true, not whether they are actionable in themselves, but whether they were spoken in the course of judicial proceedings, and whether they were relevant and pertinent to the cause or subject of inquiry.' "

By the Administrative Procedure Act, administrative proceedings have been given the dignity of at least quasi-judicial proceedings. There is little reason why Albert's testimony should not be protected from that point of view. The term "judicial proceeding" is not restricted to trials but includes every proceeding of a judicial nature before a court or official clothed with judicial or quasi-judicial power. *Richeson v. Kessler,* 1953, 73 Idaho 548, 255 P.2d 707; *Ramstead v. Morgan,* 1959, 219 Or. 383, 347 P.2d 594; for many other cases,

The majority takes the view that Albert is liable because in the administrative proceeding, he expressed the view that Holso's conduct bore an important relationship to the function of education. If such an opinion is to be stifled and a liability affixed, then the judicial function is being destroyed. The charges were relevant and pertinent to the subject of inquiry with respect to Holso's fitness as a teacher in a public school and the superintendent should not be condemned for them.

The proposition and reason for such a rule is excellently stated in *Petroni v. Board of Regents,* 1977, 115 Ariz. 562, 566 P.2d 1038, rev. den.:

> "* * * Decisions on the granting of academic tenure necessarily have a long range effect on the character of the state's educational institutions. If the officials responsible for recommending whether a permanent position should be granted are exposed each time they make a negative evaluation to the possibility of a jury trial on their motives and the truthfulness of their statements or the

accuracy of their opinions, the risk inherent in all but the most extreme cases would tend to deprive the governing body of the candor essential to an accurate appraisal of the applicant's qualifications. It is not for the protection of the public officer but for the protection of the public that absolute immunity is recognized in these circumstances. See *Hughes v. Bizzell,* 189 Okl. 472, 117 P.2d 763 (1941)."

Even if we apply only a qualified immunity, as apparently does the Supreme Court of the United States, the statements of Albert related to a professional distaste, well supported by the courts, for a teacher bringing disrepute upon the educational system, rather than any personal animosity.

However I look at it, I cannot accept what appears to me as an arbitrary view of the majority that since the administrative decision of termination has been reversed, a liability at once must be assessed against the superintendent. I would suggest that the trial judge may even have a different attitude if he could see that there was no official school board liability and the whole onerous burden is thrust upon the superintendent. While I consider the plaintiff's physical condition a burden upon the school system, at the same time, he has value as a teacher and it does not substantially interfere with his performance of duty, though presenting an extremely close question. The plaintiff's grading can be corrected. He made a serious mistake of judgment in discussing his personal problems, particularly the one he elected to talk about. There, again, it does not appear that it was a matter of habitual practice with him, as was his isolated instance of insubordination. Any question of morality was not a ground for termination, either charged or found.

The board had good cause, as did the superintendent to explore those variances from accepted teacher behavior as grounds for termination but should not be penalized for doing so. If every authorized legal action looking toward termination carries with it the risk of personal liability, the public and its schools will suffer, because those in charge will avoid the weeding proc-

ess necessary to eliminate the unfit, the incompetent and discourage upgrading academic personnel.

I would only affirm the district court on its reversal of the termination and allow no other recovery.

THOMAS, Justice, concurring in part and dissenting in part, with whom RAPER, J., joins.

While I agree with the result reached in the majority opinion affirming the district court with respect to Holso's termination and reversing the judgment against the School Board for damages, I must dissent from the conclusion of the Court to affirm the judgment against A. L. Albert. However much any of us may object to Albert's conduct in this matter, our response to his conduct is limited by the dual strictures of the law and reason.

The elements of a cause of action under title 42, U.S.C. § 1983 are:

1. That the "defendant act under color of" state or local law, and
2. That the plaintiff be subjected to a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

*Adickes v. S. H. Kress and Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Prebble v. Brodrick,* 535 F.2d 605 (10th Cir. 1976); *Smith v. Young Men's Christian Association of Montgomery, Inc.,* 462 F.2d 634 (5th Cir. 1972); *Sigler v. Lowrie,* 404 F.2d 659 (8th Cir. 1969); *Marland v. Heyse,* 315 F.2d 312 (10th Cir. 1963); *Stringer v. Dilger,* 313 F.2d 536 (10th Cir. 1963); *Marshall v. Sawyer,* 301 F.2d 639 (9th Cir. 1962); *Williams v. Hot Shoppes, Inc.,* 110 U.S.App. D.C. 358, 293 F.2d 835 (1961); *Baron v. Carson,* 410 F.Supp. 299 (N.D.Ill.1976); *Davidson v. Dixon,* 386 F.Supp. 482 (D.Del. 1974); *Ames v. Vavreck,* 356 F.Supp. 931 (D.Minn.1973); *Flood v. Margis,* 322 F.Supp. 1086 (E.D.Wis.1971). See particularly *Lombard v. Board of Education of the City of New York,* 407 F.Supp. 1166 (E.D.N. Y.1976).

In setting forth these elements, and in the results which are reached, the cases, including those cited in the majority opin-

ion, contemplate and encompass an actual deprivation of a constitutional right. This is a limitation upon the federal rule of liability which we are applying, and since it is a federal rule of liability a state court is not justified in extending the limits of the rule which the federal authorities announce.

The district court in this instance, and the majority of this Court, do not describe an actual deprivation of Holso's constitutional right of freedom of association. It must be noted that the majority describes what A. L. Albert did as "attempting to deprive plaintiff of his teaching career on the basis of constitutionally impermissible reasons." Several courts have pointed to the necessity for a causal relationship between the conduct of a defendant and the deprivation of the constitutionally protected right asserted by the plaintiff. *Hoffman v. Halden*, 268 F.2d 280, 296 (9th Cir. 1959); *Cuiksa v. City of Mansfield*, 250 F.2d 700 (6th Cir. 1957); *Kenney v. Fox*, 232 F.2d 288 (6th Cir. 1956); *Whittington v. Johnston*, 201 F.2d 810 (5th Cir. 1953). The factual circumstances in these cases differ from this case, but the reasoning relating to the concept of proximate causation is quite apt.

The majority of the Court assumes that the focus of Holso's action is a complaint anent the deprivation of his right to freely associate with whom he pleases. In actuality his cause of action is related to his property right in his employment, and in demonstrating his right to recover under Title 42 U.S.C. § 1983 it is incumbent upon Holso to show that he lost his job because he exercised his constitutional right freely to associate. In fact that was not a ground which was relied upon by the School Board for his discharge, and the district court did not find that it was either an actual or concealed basis for his discharge. It follows that Albert did not succeed in causing Holso to be deprived of his job for that constitutionally impermissible reason, and the legal effect of that circumstance is that the tort described in Title 42 U.S.C. § 1983, was not committed. Liability for damages does not follow when a tort is not committed.

I am dismayed by the effect of this decision because while the Court does not say that immorality is constitutionally protect-

ed conduct so far as a teacher is concerned the effect of the ruling may be substantially the same. Under this decision, whenever a school administrator is informed of circumstances which may manifest immoral conduct he investigates that situation and reports it to the school board at his peril. If he is wrong, he is subject to suit. If he is right, the teacher will be discharged. I hope that school administrators are blessed with the courage and commitment to pursue their responsibilities in the face of that peril, but I fear that not all will be possessed of that degree of courage and commitment. My witness is that the performance by school administrators of an appropriate aspect of their duties is chilled substantially by this extension of the federal tort to cover attempted conduct rather than consummated conduct.

With respect to the grading practices these were a ground for discharge by the Board. I cannot agree that a teacher's grading practices are constitutionally protected conduct. No case is cited in the majority opinion which so holds. Reason dictates that evaluation of students is something quite different from instruction of students. The rationale which the courts have structured relative to the concept of academic freedom is that it is a species of free speech which is protected by the First Amendment. E. g., *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969); *Webb v. Lake Mills Community School District*, 344 F.Supp. 791 (N.D. Iowa 1972); *Mailloux v. Kiley*, 323 F.Supp. 1387 (D.Mass.1971); *Parducci v. Rutland*, 316 F.Supp. 352 (M.D.Ala.1970).

In developing this rationale the courts have emphasized the necessity of protecting the free communication of ideas in an aca-

demic setting. Grading or evaluation of students is not a function that involves the communication of ideas, and for that reason grading does not logically fit within the protection of the First Amendment. Every student under our system of public education has an interest in a grade which is at least equal if not paramount to the interest of the teacher in that grade. If the grade is to be challenged it likely must be done through the channel of administrative authority within the school. The student or the administrative authority must assume the burden of demonstrating that the grade was erroneous, but to foreclose relief by protecting the teacher's grading practice under the First Amendment is not fair.

Since I conclude that Holso's discharge by the School Board was not caused by Albert insofar as the protected right to freedom of association is concerned (see *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)), and since I conclude that the grading practice which was a ground for discharge is not constitutionally protected conduct, I am convinced that Albert did not commit the tort described in Title 42 U.S.C. § 1983. Since the tort was not committed there is no basis for Albert's liability, and the judgment against Albert personally should be reversed. He has been punished without due process of law.