**BOARD OF TRUSTEES OF SCHOOL DISTRICT NO. 4, BIG HORN COUNTY, Wyoming, Appellant (Defendant),**

v.

**John R. COLWELL, Appellee (Plaintiff).**

No. 5215.

Supreme Court of Wyoming.

May 12, 1980.

Gary P. Hartman, Greybull, signed the brief and appeared in oral argument on behalf of appellant.

Patrick E. Hacker, of Patrick E. Hacker & Associates, Cheyenne, signed the brief and appeared in oral argument on behalf of appellee.

Ross D. Copenhaver, of Ross D. Copenhaver, P. C., Powell, filed amicus curiae briefs on behalf of Wyoming School Boards Association.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROONEY, Justice.

This is an appeal from an order of the district court which reversed the dismissal of appellee from his teaching position by appellant-Board of Trustees for insubordination.

We reverse the district court order.

### PREAMBLE

At the outset, we express disappointment at the failure of those involved in this matter to have acted in a more considered and deliberate fashion. A recognition on their part that their principal purpose in respect to the matter here involved was the education of the children of the district would have resolved such matter without a school board hearing (which lasted into the early morning hours), a district court proceeding

and, finally, this appeal—a great expenditure of money and time. Appellee could have been more understanding of the needs of the students at Basin for the instruction which he could furnish; he could have wholeheartedly entered into efforts to secure allocation of books, desks, et cetera toward this purpose; he could have attempted to work out a scheduling of his proposed team-teaching class in Manderson at other than the first period; and certainly he could have attempted to work out his problems by seeking advice and help from his superintendent. The principals of the two schools could have been more prompt in giving positive directions to appellee. They could have more carefully explored the available options and communicated them to appellee. All of those involved could have been less intractable, less perverse and more cooperative. Their failure in these respects brings this matter to us in a context in which we can only apply cold legal propositions. These comments are made in hope that they will engender a better cooperative spirit between school administrators and teachers in future matters such as this.

## STANDARD OF REVIEW

■ For the purpose of reviewing the propriety of the district court's action, we will review the agency action as though the appeal were directly to this court from the agency. We are governed by the same rules of review as was the district court. *Federal Trade Commission v. Sun Oil Company*, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963); *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 436 P.2d 828 (1968); *Alabama Public Service Commission v. Nunis*, 252 Ala. 30, 39 So.2d 409 (1949); *Diamond Ring Ranch, Inc. v. Morton*, 10th Cir. 1976, 531 F.2d 1397.

Therefore, we will not substitute our judgment for that of the agency. *Shenefield v. Sheridan County School District No. 1*, Wyo., 544 P.2d 870 (1976); *Sweetwater County Planning Committee for Organization of School Districts v. Hinkle*, Wyo., 493 P.2d 1050 (1972). Appellee has the burden of establishing the insufficiency of the evidence to sustain the Board's decision. *Board of Trustees, Laramie County School District No. 1 v. Spiegel*, Wyo., 549 P.2d 1161 (1976). In making the determination as to whether or not the agency findings and conclusions are supported by substantial evidence as required by § 9-4-114(c)(ii)(E), W.S.1977, 1979 Cum.Supp., we set forth the following standard in *Howard v. Lindmier*, 67 Wyo. 78, 214 P.2d 737, 739, 740 (1950), as quoted in *Board of Trustees, Laramie County School District No. 1 v. Spiegel*, supra, 549 P.2d at 1177, 1178:

" ' . . . Even if the court comes to a different conclusion than that of the Land Board, considering the evidence as a whole, that . . . is in no sense conclusive. The court must go further. It must be able to determine that the Land Board might not reasonably, under the same state of facts, have come to a different conclusion; . . . *yet the rule adopted and followed by appellate courts here and elsewhere of deferring their opinions as to the weight and credibility of the evidence to that of the trier of the facts in the first instance should be adhered to in land lease cases.*' [Emphasis in original text]

\* \* \* \* \* \*

" ' . . . the term "substantial evidence" does not include the idea of weight of evidence, although it is more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . ' "

See *Laramie River Conservation Council v. Industrial Siting Council*, Wyo., 588 P.2d 1241 (1978); *Barger v. Board of Trustees of School District No. 3, Goshen County*, Wyo., 494 P.2d 544 (1972).

Prior to 1979, the "substantial evidence" standard was definitely mandated in the Wyoming Administrative Procedure Act:

"(c) The court's review pursuant to the provisions of this section shall be limited to a determination that:

\* \* \* \* \* \*

"(iv) The findings of facts in issue in a contested case are supported by substantial evidence * * *." Former § 9–4–114(c), W.S.1977.

This subsection was amended, effective May 25, 1979, to require agency action, findings and conclusions to be supported by substantial evidence, but also to provide for a review of the "whole record." [1] Under this standard, we do not examine the record only to determine if there is substantial evidence to support the Board's decision, but we must also examine the conflicting evidence to determine if the Board could reasonably have made its findings and order upon all of the evidence before it. After reviewing the history and rationale in changing the "substantial evidence" rule in the Wagner Act to the "whole record" provision of the Federal Administrative Procedure Act (similar to present provisions of § 9–4–114(c)), the consideration is stated in *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), and quoted in *National Labor Relations Board v. Walton Manufacturing Company*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962):

"* * * the 'reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view,' it may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*' * * * "

The petition for judicial review by the district court was filed in this case on November 27, 1978. The findings and order of the district court were dated September 10, 1979. Without making a determination as to whether the standard of review pursuant to the 1979 amendment is applicable to this case, we note that such standard is far more favorable to appellee's position than is the former "substantial evidence" standard, and that the action, findings and order of the Board must be sustained under either standard (the findings and order of the district court must be reversed). Therefore, we will review the whole record and consider conflicting evidence and not only the presence of substantial evidence to support the Board's findings, thus giving appellee the benefit of the standard most favorable to him.

## SUMMARY OF EVIDENCE

To apply the foregoing standard, we must carefully examine the evidence presented by this case, particularly as such applied to the elements of insubordination. To do so, we set forth a summary of the evidence in far more detail than usual.

William Diercks, principal of the Manderson school since 1951, testified that included among his other duties were those of scheduling and assigning teachers to classrooms; that the Manderson school was small with

---

1. Section 9–4–114(c), W.S.1977, 1979 Cum. Supp., provides:

    "(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, *the court shall review the whole record* or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

    "(i) Compel agency action unlawfully withheld or unreasonably delayed; and

    "(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

    "(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

    "(B) Contrary to constitutional right, power, privilege or immunity;

    "(C) In excess of statutory jurisdiction, authority or limitations, or lacking statutory right;

    "(D) Without observance of procedure required by law; or

    "(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute." (Emphasis supplied.)

only 70 students in grades 7 through 12 and 9 or 9½ teachers; that there was no preregistration in the Manderson school, with a tentative schedule being prepared each year subject to adjustment after the first week of school; that in the school year 1978–1979, appellee was in his third year of teaching Industrial Arts at Manderson, including courses in shop and crafts; that he taught welding in his first two years; that in July 1978, Terry Roice, principal of the Basin school (School District No. 4, Big Horn County, maintains schools in both Manderson and Basin) talked to him concerning an overload of students in Industrial Arts for the ensuing school year and asked if appellee could be authorized to help by teaching a class in Basin; that he (Diercks) concluded that appellee would have time to do so and that the best period for such would be the first period; that other teachers in the district taught classes in both schools and appellee's predecessor had done so; that on August 14, 1978, he told appellee that he "probably" would be teaching a class in Basin; that the superintendent was told of the contemplated arrangement at a meeting of the principals; that on August 28, 1978, a teachers' meeting was held at which appellee was present and at which he (Diercks) went over the rules and regulations and class schedule during which he announced that appellee would "probably" be going to Basin the first period and that necessary transportation would be furnished; that on August 30, 1978, registration day, a meeting was held for teachers and students at which he (Diercks) went over the schedule and room assignments and at which he told appellee that he would go to Basin to teach a first period class and the students were told that there was a good possibility that they would be taking welding at a first period class in Basin; that on August 31, 1978, he noticed that appellee had not left for Basin and told him to go, and appellee did go; that on his return from Basin on August 31, 1978, appellee said there were problems over books and desks in a classroom at Basin; that on his return from Basin on Friday, September 1, 1978, appellee said there was a problem with his teaching first, second or third year welding students and that he wanted to meet with Roice and Diercks concerning the problem; that the meeting was set up for the following Wednesday, Monday of that week being a Labor Day holiday; that appellee went to Basin on September 5, 1978 for the first period class; that on September 6, 1978, appellee and Roice met with him (Diercks) in Roice's office and appellee said he wanted to straighten out his duties; that when he (Diercks) left the meeting, he thought things were going to be resolved since Roice said appellee could conduct his classes in the main building where there were desks and books, and since Roice, appellee and Hagerman, the Industrial Arts teacher at Basin, were to meet and work out the teaching plan; that on September 7, 1978, he offered the keys to appellee for fueling the van for the trip to Basin, and appellee told him he was not going to Basin since he was not "going to be a patsy to myself [Diercks] and Mr. Roice and the next move would be up to us"; that appellee did not go to Basin but collected some students from the study hall at Manderson whom he said had registered for a first period class, and that he (Diercks) sent the students back to the study hall; that he called Roice who came to Manderson and met with him (Diercks) and appellee; that he later met with Superintendent McLaren and Roice; that appellee was called into the room and given a letter of suspension by McLaren and that appellee said that he didn't have to read it and knew what was in it anyway. Diercks also testified that welding was not listed on appellee's transcript, but that he was certified by the State Department of Education to teach in all areas of Industrial Arts and welding was included therein according to the state's manual; and that neither the superintendent nor the Board gave appellee direct orders to teach the first period class in Basin.

Terry Roice, principal of the Basin school for two years, testified that among his other duties he schedules classes, makes teacher assignments and performs other responsibilities delegated by the superintendent;

that students preregister at the end of the previous year for classes in the Basin school; that 30 to 40 students preregistered for woodworking and shop; that he would therefore either have to schedule more classes to accommodate them or not provide the instruction for some of the students inasmuch as the one Industrial Arts instructor at Basin could not handle that many students; that he talked to the superintendent about the possibility of obtaining help in teaching a class at Basin by using the Manderson Industrial Arts teacher; that the superintendent gave him permission to talk to Diercks, the Manderson principal, for such use; that when he talked to Diercks, Diercks said he would look at the schedule and let him know about it later; that arrangements for such use were later finalized with Diercks for the first period; that he prepared the schedule in August to show appellee teaching a woodworking and welding class from 8:30 a. m. to 9:20 a. m.; that appellee appeared at such class on August 31, September 1, 5 and 6, 1978, the first four days of classes for the school year; that on September 1, 1978, Diercks called and said that appellee wanted a meeting to discuss teaching of the class; that the meeting was set for September 6, 1978 at which time appellee raised the questions of communication, textbooks, desks and his qualifications to teach welding; that he thought the issues were resolved at the meeting inasmuch as he told appellee he would make available any needed textbooks and the drafting room could be used for any desk work; that he told appellee he could teach the woodworking class and the Basin Industrial Arts teacher could teach the welding and the choice in this respect would be appellee's and that appellee would meet with Hagerman the next day to work out the details; that he told appellee he expected him to cooperate with Hagerman to provide a good class the first period; that he received a call from Diercks on September 7, 1978 to the effect that appellee refused to come to Basin; that he reported this fact to the superintendent and went to Manderson at the superintendent's direction where he met with

Diercks and appellee; that he then asked appellee if he refused to teach the class in Basin and appellee responded, "not when I have a class to teach in Manderson," to which Diercks said, "you don't have a first period class at Manderson"; that he then reported the happenings at the meeting to the superintendent; that he later was with the superintendent, Diercks and appellee in Manderson when appellee was given his suspension letter; that appellee's comment on receipt of the letter was "very good"; that he had never talked to appellee before the start of school concerning the assignment and believed it was courteous to have Diercks do so; and that he had never looked at appellee's transcript or teaching qualifications.

Dr. John McLaren, Superintendent of Schools for Big Horn County School District No. 4 for four years, testified that he delegates to principals the duties and responsibilities of scheduling classes and assigning teachers; that in mid-July, Roice conferred with him concerning the problem of having 28 or 29 students registered for Industrial Arts and suggested that the use of the Manderson teacher might solve the problem; that he (McLaren) told Roice to check with Diercks and see what could be worked out; that later he was advised that the schedule had been worked out, and, still later, at the principals' meeting preceding the start of school, he asked if the arrangement was finalized and was advised that it was and that appellee was so notified; that he approved such schedule; that on September 1, 1978 he was advised that appellee had a number of "excuses" for not teaching the class and that a meeting was scheduled for the principals and appellee to discuss the problems and possible solutions; that Roice later advised him concerning appellee's concerns and the solutions expressed to appellee and his feelings that the problem was solved; that he received a call from Roice on September 7, 1978 to the effect that Diercks had reported that appellee was refusing to go to Basin; that he directed Roice to meet with Diercks and appellee and see if appellee "was going to stay with

that particular decision that he evidently made"; that when Roice called and said appellee again refused to teach the class, he (McLaren) decided to suspend him; that when he gave the letter of suspension to appellee, appellee said "very good" and then said "I might as well leave," and he did so; that he had no knowledge of appellee's failure to obey orders in the past; that he did not bring the question of teaching the first period class in Basin to the Board's attention as a transfer; that he had directed appellee to teach such class through the principals, and they had authority to act in his behalf; that he sent in an accreditation report on appellee each year, listing appellee's assignment as a welding teacher and the state did not give any indication that he was not qualified to teach welding; and that appellee had made no effort to see him during the time in which the problem was developing.

Appellee was called as a witness by the appellant. He testified that he had taught general shop and crafts and basic welding at Manderson for the two previous years; that he had picked up his welding knowledge on his own; that Diercks had said on August 19, 1978 that he (Diercks) would like appellee to teach a class in Basin and asked him what he thought of it; that he answered that he did not know; that Diercks had possibly said at the teachers' meeting on August 28, 1978 appellee would probably be teaching a class in Basin, but he did not hear the statement; that he heard Diercks' statement at the meeting of faculty and students on August 30, 1978 that if students wanted to sign up for welding they could go to Basin to take it; that on August 29, 1978 he told Diercks that he felt that before an assignment to Basin is made, "we should see if we don't have an obligation to our own students"; that the first time he definitely was told he was going to Basin for the first period was on August 30, 1978; that he taught a first period class in Basin during the first four days of school, August 31, and September 1, 5 and 6, 1978; that on the first day he was informed he was to teach welding and not woodworking, and on the second day the students told him that Hagerman said they could not bring textbooks or chairs to the shop; that he advised Diercks of these facts on return to Manderson; that on the third day he knew books were available and that the students told him textbooks and chairs were available in a room; that he asked for a meeting with the principals and met with them on September 6, 1978 and told them he was not qualified to teach Welding 1, Welding 2 and Welding 3 and had previously taught only Basic Welding; that he was advised that he could "swap" with Hagerman and teach woodworking; that on September 7, 1978, Diercks asked him if he was going to teach the Basin class on that day, and he told Diercks that he was on the way to the shop with his own students; that Diercks "took the students back out of the shop"; that he refused to go to Basin on September 7, 1978; that he had gone to the study hall and had nine students sign up to take a class from him in Manderson during the first period; that he did not go to Basin on September 7, 1978 because he felt he "wasn't getting across or getting any satisfaction through this meeting with the principals" and he felt he "had an obligation of thirteen students in Manderson" and he would "get past two principals and get to someone that was going to make a decision."

Phillip Juillard testified that he and other teachers taught classes at both the Manderson school and the Basin school.

Lin Doyle, a teacher at the Manderson school, testified that he was at the teachers' meeting on August 28, 1978; that appellee was present; that Diercks said at the time he was going over the schedule that appellee probably would be teaching in Basin; that he was also present at the faculty-student meeting on August 30, 1978; that appellee was present at that meeting also; and that Diercks said appellee would be going to Basin and students could get a class with him, but he (Doyle) could not say for sure but believed that the class was said to be welding.

Bruce Fritz, a teacher at the Manderson school, testified that he was at the teachers'

meeting on August 28, 1978; that appellee was present; that Diercks went over the schedule with each teacher "and said this will probably be but he says, as you know in the past, there is always changes"; that he asked appellee if he would go to Basin the first period in the morning; that he was also present at the faculty-student meeting on August 30, 1978; that all of the teachers were there; and that Diercks told the students that appellee would be going to Basin and there was a possibility that the students could be bussed to Basin for a welding class.

Claude Craft testified that he was a recently elected member of the School Board (he disqualified himself from sitting on this hearing at the beginning of it); that at the time he was running for the office and on September 1, 1978, appellee told him he was being asked to go to Basin to teach a class in the first period and forego a class of students that he had in Manderson, but that he said, "no way am I going to do that," and "I will maybe go down the road but no way will I go to Basin."

Reynolds Kost, a maintenance man for School District No. 4, testified that appellee showed him the suspension letter on September 7, 1978 and talked about his problems with the administration and that, "it had gone far enough, that he was going to make it either come to a head or something of that sort."

Kathy LaLonde was appellee's only witness. She testified that she was an Art teacher at Manderson; that she and appellee discussed a team-teaching class in the spring of 1978 and mentioned to Diercks that they were interested in doing it; that Diercks said it would be considered and would be discussed the next year; that it was mentioned again to Diercks during the teachers' meeting on August 28, 1978, and Diercks said he would see how the class schedule worked out and that it might be a possibility; that students were asked at registration time to indicate an interest in signing up for such class; that several did sign up for the first and second period classes; that on August 30, 1978, Wednes-day evening, they showed Diercks the sign up; and that that was the first she knew that appellee was to go to Basin.

Introduced into evidence were: (1) the tentative schedule for Manderson school, reflecting open periods for appellee during the first two periods, with first period being from 8:40 a. m. to 9:30 a. m., and second period being from 9:33 a. m. to 10:18 a. m.; (2) the class schedule referred to by Roice in the foregoing summary of his testimony; (3) the contract between appellee and School District No. 4 for the 1978-1979 school year, reflecting appointment "to a position in the Public Schools of said District" commencing August 28, 1978; (4) the letter of suspension; (5) appellee's Industrial Arts certification from the State Department of Education; and (6) a copy of the Policies of the Board of Trustees, Big Horn County School District # 4, 1978-1979, reflecting that:

Page 5:

"a. The Board of Education shall exercise general supervision of the school system. * * * It will delegate executive, supervisory, and instructional authority to employees to carry out the functions of the district. * * *

\* \* \* \* \* \*

"The direct Administration of the school system is delegated to the Superintendent of Schools whom the Board appoints to act as Executive Officer of the Board. The Superintendent is responsible to the Board for the execution of its policies and its legislation and for such other duties as may be assigned to him by the Board of Education."

Page 7:

"The Superintendent shall be the chief executive officer of the Board of Education and the administrative head of all divisions and departments of the school system."

Pages 8 and 9:

"The Superintendent shall have other specific duties and responsibilities as follows:

\* \* \* \* \* \*

"e. To make such assignments and transfers of employees as are necessary, in his professional judgment, to secure the highest efficiency of the entire staff * * *."

Page 11:

"The chief administrative officer in each school shall be the Principal * * *.

*   *   *   *   *   *

"d. In light of general policies, plans, and regulations, he shall be responsible for the detailed organization of the program of the school, for the assignments and duties of staff members and for the administration and supervision of the instructional program."

Page 13:

"r. He [the principal] shall perform other duties as the Superintendent may direct."

Page 14:

"a. Teachers shall be assigned to positions by the Superintendent, and shall be responsible directly to the Principals under whom they teach."

Page 15:

"q. They shall not absent themselves from school nor from the classroom without the approval of the Principal or Head Teacher.

*   *   *   *   *   *

"t. They shall perform such other duties as the Principal or Superintendent of Schools may direct."

Page 22:

"*Assignment.* Assignment of teachers shall be made under direction of the Superintendent of Schools. The recommendations of the principals shall be considered in assignment. Whenever possible, teachers shall be assigned to positions for which they are best qualified.

"*Transfer.* Assignments may be changed whenever the best interest of the District will be served. Transfers may be initiated by the staff member himself or by an appropriate administrator.

"All requests for transfers shall be processed through proper channels. Involuntary transfers may be made by the Board of Education upon the recommendation of the Superintendent of Schools."

Finally, judicial notice can be taken of the fact that the distance between Manderson and Basin is twelve miles, or about fourteen or fifteen minutes' driving time.

## INSUBORDINATION

■ Insubordination is a ground for dismissal of a teacher. Section 21–7–110(a), W.S.1977.

In *Board of Trustees of Weston County School District No. 1, Weston County v. Holso,* Wyo., 584 P.2d 1009, 1015, 1016 (1978), we "embraced" the following definitions and concepts of "insubordination" (citing cases in support thereof).

Insubordination is a "constant or continuing intentional refusal to obey a direct or implied order, reasonable in nature, and given by and with proper authority."

It includes "a willful refusal * * * to obey reasonable rules and regulations."

Emphasis is placed "on the presence of a persistent course of willful defiance."

The elements, then, of "insubordination" are:

1. Persistent course of
2. willful defiance in
3. refusing to obey
4. a reasonable
5. direct or implied order or rules and regulations
6. given by or with proper authority.

■ In applying the aforesaid standard of review to the evidence in the whole record in this case, we find that a reasonable mind, considering all of the conflicting evidence, if any, might accept as adequate the following evidence to support the indicated conclusions:

1. Conclusion that appellee's course of conduct was persistent. Appellee refused to go to Basin on September 7, 1978, and told Diercks that he was not going to be a patsy for the two principals. Thereafter and on the same day, appellee collected students from the study hall and was tak-

ing them to a class which would conflict with the class he was directed to teach when Diercks stopped him. Both principals then met with appellee to see if he was going to stay with his decision, and appellee again refused to teach the assigned class. Upon receiving his letter of suspension, appellee said, "very good" and, "I might as well leave." The order here involved the basic obligation of appellee's employment—to teach assigned classes. His refusal would require a reformation of the school's teaching schedule. The directed activity was not an incidental part of his employment, but *was* his basic employment duty. In this respect the incident differed substantially from the incidents in *Board of Trustees v. Holso*, supra, in which the alleged insubordination consisted of a failure to have a meeting and to submit a class outline. Importunity did not really exist in the *Board of Trustees v. Holso*, supra, incidents. It does exist in this incident. And it is a handmaiden of persistency as used in the context here under consideration. Although the insubordination did not occur until September 7, 1978, appellee's attitude prior thereto, as reflected by his comment to Board candidate Craft on September 1, 1978, that he "will maybe go down the road but no way will I go to Basin," and by his resistance to the assignment during the few days he taught the class, reflect his intention to persist in his opposition to the order.

2. Conclusion that the defiance was willful. The appellee actually taught the class for four days before he refused to teach it further. Negligence or forgetfulness were not reasons for failure to teach the class. There was no misunderstanding on appellee's part as to that which he was directed to do. His refusal evidenced a positive intent to do other than that directed, i. e., evidenced intent not to teach the class.

3. Conclusion that there was a refusal to obey. Likewise the refusal was positive and direct. It was expressed more than once.

4. Conclusion that the order was reasonable. The order was to teach only one class in Basin. Appellee's transportation was provided. Appellee was not scheduled for a first or second period class in Manderson, and the Basin class was a first period class. The distance to be traveled between Basin and Manderson was only twelve miles or fifteen minutes' travel time.[2] Other teachers regularly taught classes in both schools, and appellee's predecessor did so. The large enrollment of students in Basin for the Industrial Arts course necessitated assistance of appellee to teach them or they would have been deprived of the instruction. Problems relative to chairs, desks and appellee's lack of qualification to teach welding were solved prior to appellee's refusal to teach on September 7, 1978 by arranging for appellee to teach only woodworking and by furnishing the necessary chairs and books. Appellee actually taught the assigned class for four days before his refusal.

5. Conclusion that the refusal was to obey a direct or implied order or rules and regulations. Both principals told appellee that he was expected to teach the first period class in Basin. Although Diercks used the word "probably" the first few times the assignment was brought to appellee's attention, the direction was thereafter positively and directly given to him more than once before he refused to comply with it.

6. Conclusion that the order was given by or with proper authority. The duty and responsibility to run the affairs of the school district is placed by law in the board of trustees with authority to delegate administrative powers to the superintendent as the chief administrative officer and to principals. Sections 21–3–105, 21–3–110(a)(i), 21–3–111(a)(vi)(A) and (B), W.S.1977. The Board established policies which specifically delegated to the superintendent the responsi-

---

**2.** There were thirteen minutes between the end of the first period in Basin and the start of the second period in Manderson inasmuch as classes do not start and end at the same time in the two schools. In any event, appellee was not scheduled to teach the first and second period classes in Manderson.

bility of making "assignments and transfers" of employees, and which delegated to the principals the responsibility for "assignments and duties of staff members." The policies directed the principals to perform "other duties as the Superintendent may direct." The policies provide that "teachers shall be assigned to positions by the Superintendent, and shall be responsible directly to the Principals under whom they teach." The policies additionally state that "assignments shall be made under the direction of the Superintendent of Schools." Appellee's assignment to teach the first period in Basin was approved in advance by the superintendent, who testified that "he had directed appellee to teach the class through the Principals." Appellee's teaching contract was for appointment "to a position in the Public Schools of said District," not to the Manderson school.

Appellee points to a policy provision that "involuntary transfers may be made by the Board of Education upon recommendation of the Superintendent of Schools" to mandate that appellee's assignment to teach the first period class in Basin would be effective only if made by the Board. The fact that the provision uses the permissive word "may" rather than the mandatory word "shall"; the fact that the authority for making assignments is given to the superintendent or principals in at least four other places in the policies; the fact that authority is given elsewhere in the policies for the superintendent to make "transfers of employees as necessary, in his professional judgment"; and the fact that "assignments" and "transfers" are not specially defined in the policies, all lead to the conclusion that the intent of the Board was to delegate to the superintendent the authority to assign appellee to teach the first period class in Basin. Employee was not asked to move from the Manderson teacherage. His Manderson classes were not discontinued. He remained under the supervision of the Manderson principal. Other teachers taught in both schools. In the policy provi-

sion that "teachers shall be assigned to positions by the Superintendent and shall be responsible directly to the Principals under whom they teach," the word principals is plural, indicating the intention to have teachers subject to direction of more than one principal and therefore be assigned to teach in more than one school. Appellee's contention that only the Board could direct a "transfer" for him might have more substance if the change was from one certified area to another (Industrial Arts to languages or to mathematics, etc.), or if he were actually being moved from his teacherage and assigned to a complete new schedule in another school. Such could have reference to the basic employment purpose. However, to contend that the Board, consisting of unpaid members devoting a few hours a week to the school district business, and not necessarily trained educators, should be required to approve each specific class schedule and class teaching assignment is impractical.

It must be remembered that we do not determine whether or not we would consider the evidence to be sufficient to establish insubordination. Our standard of review is to determine if a reasonable mind (although it may differ from ours) might accept the presented evidence as adequate to support the conclusion reached by the Board of insubordination. We find that it does.

## FINDINGS OF THE DISTRICT COURT

As previously noted, the trial court was subject to applying the same standard as are we. In its findings and order, the trial court made reference to seven of the Board's findings of fact and conclusions of law[3] which the trial court found to be not supported by substantial evidence. The foregoing discussion makes unnecessary further consideration of four of these seven items, i. e., the Board's twelfth finding that appellee's refusal to teach represented a persistent course of willful defiance; the

---

**3.** The language that "conclusions of law" can be found to be "not supported by substantial

evidence" has foundation in the language of § 9–4–114(c), W.S.1977 (see fn. 1, supra).

Board's third and fourth conclusions that appellee was insubordinate; and the Board's sixth conclusion that appellee's contract should be terminated. The only comment needed with reference to the other three items is that they are immaterial to the fact of insubordination on September 7, 1978, except, as already discussed, insofar as they may bear on appellee's intention or attitude to persist in his decision, later made, to not obey the order to teach the first period class in Basin, i. e., the Board's eleventh finding that appellee knowingly, and without authority, scheduled a class in Manderson during a period he was to teach in Basin; the Board's fifteenth finding that appellee was qualified to teach advanced welding; and the Board's second conclusion that appellee had definite knowledge of his assignment to teach a first period class in Basin prior to August 30, 1978. Whether or not the conflicting class was scheduled by appellee has no other materiality to the willful defiance in refusing to obey a reasonable direct order later given by proper authority, which order directly and indirectly disapproved of and canceled such class; and whether or not appellee had knowledge of the assignment prior to August 30, 1978 is immaterial to the fact that he had such knowledge on August 31, and September 1, 5 and 6, 1978; and whether or not appellee was qualified to teach advanced welding is immaterial inasmuch as the assignment was adjusted after he made his complaint concerning his lack of qualifications to provide that he would teach woodworking rather than welding.

Finally, we note that the only legal authority referred to by the trial court in its opinion letter is *Board of Trustees v. Holso,* supra. The trial court referred to the language in that case which indicated that a persistent course of willful defiance was an element of insubordination. We have already commented on the perimeters of this element. They preclude the interpretation placed on the language by the trial court. Further, it is noteworthy that neither of the two cases cited in *Holso* for the necessity of placing emphasis on this element reach the situation of this case.

In *Johnson v. United School District Joint School Board,* 201 Pa.Super. 375, 191 A.2d 897 (1963), it was held to be a persistent course of willful defiance for the teacher to refuse to attend an open house on one occasion, having been told thrice to do so before the date of the open house and the teacher having said once that she would not attend and having not attended.

In *Fernald v. City of Ellsworth Superintending School Committee,* Me., 342 A.2d 704 (1975), it was held to be a persistent course of willful defiance for the teacher to absent herself on two successive days from school, having advised the superintendent one time that she planned to do so and had arranged a substitute, and the superintendent having told her one time that he would not approve her absence.

A course of persistent defiance is not a course of persistent defiances. It does not require a refusal to obey a series of orders. Appellee cannot be allowed to refuse to teach the class for seven days or four weeks or five months before the course can be said to be persistent. If the attitude or intention to persist in the refusal is present, if importunity exists, repeated refusals to obey are unnecessary. Of course, the other elements of insubordination, such as reasonableness of the order and positive refusal, must also be present before insubordination is accomplished.

This matter is remanded with instructions to vacate the order of the trial court dated September 10, 1979, and to enter a judgment affirming the order of the Board.

McCLINTOCK, J., concurs in the result.