Mark D. SPIVEY, Appellant
(Complainant-Respondent),

Wyoming Fair Employment Commission
(Respondent),

v.

LUCKY MC URANIUM CORPORATION,
Appellee (Petitioner).

No. 5520.

Supreme Court of Wyoming.

Nov. 20, 1981.

---

E. James Burke and Thomas E. Campbell (argued), of Hanes, Gage & Burke, P. C., Cheyenne, for appellant.

Richard Barrett of Hathaway, Speight & Kunz, Cheyenne, and Kathlene W. Lowe of Parsons, Behle & Latimer, Salt Lake City, Utah, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

After working several months for Lucky Mc Uranium Corporation, appellant Mark

D. Spivey was discharged for "insubordination and causing inefficient operations." Appellant's grievance with respect to his discharge was initially submitted to an independent arbitrator,[1] Wade R. Cox, of Denver, Colorado. The issue submitted to the arbitrator was: Did the company violate the provisions of Article 15[2] of the Collective Bargaining Agreement by discharging grievant Mark Spivey?

After a lengthy hearing on January 24 and 25, 1978, the arbitrator issued "Decision of the Arbitrator" dated April 6, 1978. The arbitrator concluded:

" * * * Insubordination coupled with his record of warnings and a suspension for a rule violation constitutes proper cause for dismissal.

"The Company did not violate the provisions of Article 2 of Article 15 of the collective bargaining agreement by discharging Mark Spivey.[3]

"The discharge is upheld."

Mr. Spivey then filed a complaint with the Wyoming Fair Employment Commission alleging that his discharge was a result of discrimination based upon national origin and race. On June 17, 1980, the Commission issued its order finding generally in favor of Mr. Spivey and against Lucky Mc Uranium and awarded damages and attorney fees. Lucky Mc Uranium appealed the order of the Wyoming Fair Employment Commission to the district court. The district judge reversed the order of the Commission on the grounds that its Findings of

---

1. In re United Steel Workers of America AFL–CIO–CCL, Local No. 14990 and Utah International, Inc. (Lucky Mc Uranium, Corporation, Shirley Basin Mine, FMCS Arbitration File No. 77K23527).

2. "ARTICLE 15

"DISCRIMINATION
"There shall be no discrimination by the Company against any employee on account of membership in the Union or intimidation of any Steward on account of proper and lawful activity in connection with Union affairs, or on account of race, color, creed, age, sex, or national origin.
"There shall be no discrimination by the Company or the Union against any person

because of sex, race, color, creed, age, national origin, handicap, or union membership. This shall apply to hiring, placemant, [sic] upgrading, transfer or demotion, recuitment, [sic] advertising, solicitation of employment, training during employment, rates of pay or other forms of compensation, selection for training, including apprenticeship, lay-off or termination, and application for, and submission to union membership. Where the words 'he' or 'his' are used herein, it is intended to apply to both genders."

3. Apparently the arbitrator in his decision referred to paragraph two of Article 15 as Article 2.

Fact and Conclusions of Law were unsupported by competent, material and substantial evidence and were arbitrary and capricious.

Mr. Spivey identifies the issue on appeal as whether the Findings of Fact and Conclusions of Law entered into by the Wyoming Fair Employment Commission were supported by substantial evidence.

We affirm the district court.

Appellant, a black American, began to work for appellee January 3, 1977, in the company's milling operation. Before his employment by appellee he was employed by the Dallas Cowboys football organization.

On January 12, appellant applied for other positions in the company, including that of heavy equipment operator. About April 12, 1977, appellant's request to be promoted to the operating department at the mine as a scraper operator was granted and he commenced training for that job. Mr. Spivey was designated a trainee or "green hat" for a 30-working-day probationary period. During his "green hat" period appellant was disciplined on two occasions. He does not complain of either event, and on both occasions accepted the disciplinary warnings.

Appellant's employment with the company from January to late May or early June 1977 progressed normally, and he made no complaints of discrimination. During his training period appellant got along well with his immediate supervisor, Mr. Lloyd Foster, and did not complain when he was disciplined for violating company rules. Mr. Foster characterized appellant's attitude during the "green hat" period as "excellent." After that time, however, Mr. Spivey ceased to get along with his foreman and other crew members, was disciplined repeatedly, and was ultimately discharged on August 17, 1977. Coincidently, appellant's trouble with his foreman and other employees of appellee company began about the time Mr. Spivey completed his training.

Between May 5 and his date of discharge, August 17, appellant received numerous verbal and written warnings and two suspensions. Generally his warnings were for "burning" or "spinning" tires and improper passing in violation of company rules. On May 18, he and another operator, Jackson T. Wiley, were given verbal warnings when Spivey's scraper collided with Wiley's scraper, causing damage to Wiley's scraper. On May 27, appellant complained at a safety meeting about other employees passing him on the blind side. At that time the entire crew was instructed that *no one* was permitted to pass on the blind side. Appellant denied sleeping in his scraper on June 8 and denied one of the two improper passing citations given August 17; otherwise, he admitted or failed to deny the numerous violations.

On the day of appellant's discharge an employee stopped appellant's foreman Foster and told him that Spivey had almost hit him with his scraper while passing another scraper on its blind side. A second operator also witnessed the incident and corroborated that report. Foster contacted general mine foreman Brown, and on Brown's advice, gave Spivey a written warning. In addition, he told Spivey to slow down.

Soon thereafter, a third employee stopped Foster and asked if anything was wrong with Spivey's scraper because he was going very slow. The first employee then approached Foster again and told him that every time Spivey got close to him on the haul road, Spivey pulled completely off the road and slowed down. Spivey admitted this behavior, and was apparently overreacting to his earlier warning to slow down. Foster then stopped Spivey and directed him to get his things out of the scraper and accompany him to the office. Spivey responded that he was not leaving the scraper because he had to "haul dirt." Foster again ordered Spivey to go with him to the office, and Spivey again refused, stating that he was going to haul dirt. Spivey then left in his scraper. Spivey admitted these events in substantial detail. Shortly thereafter, he was waved down again and advised that he was suspended until a hearing that afternoon.

Appellant then went to the office, where management issued him his second warning of the day, suspended him for "gross insubordination, failure to follow supervisory instructions after a warning letter, becoming inefficient and causing loss of production." It was at this point that Spivey was discharged for "insubordination and causing inefficient operations."

Appellant's appeal is from the district court's review of a decision of an administrative agency (Wyoming Fair Employment Commission). An appeal in this posture is different than the usual appeal from the district court.

## I

In *Board of Trustees of School District No. 4, Big Horn County v. Colwell*, Wyo., 611 P.2d 427, 429 (1980), we said:

"For the purpose of reviewing the propriety of the district court's action, we will review the agency action as though the appeal were directly to this court from the agency. We are governed by the same rules of review as was the district court. [Citations.]

"Therefore, we will not substitute our judgment for that of the agency. * * *" 611 P.2d at 428.

In *McCulloch Gas Transmission Company v. Public Service Commission of Wyoming*, Wyo., 627 P.2d 173 (1981), we reviewed some basic rules about appeal from a decision of an administrative agency. We said that as an appellate court, in considering an appeal from an administrative agency, we must accept the agency's findings of fact when supported by substantial evidence. *First National Bank of Worland v. Financial Institutions Board*, Wyo., 616 P.2d 787, 793–794 (1980). We further stated in *McCulloch* at 178:

"* * * Substantial evidence is relevant evidence which a reasonable mind might accept as supporting the agency's conclusion. *Board of Trustees, Laramie Cty. Sch. Dist. No. 1 v. Spiegel*, Wyo.1976, 549 P.2d 1161, 1178. * * *"

In *Howard v. Lindmier*, 67 Wyo. 78, 214 P.2d 737, 739 (1950), an appeal from an administrative tribunal, we said:

"* * * Even if the court comes to a different conclusion than that of the Land Board, considering the evidence as a whole, that * * * is in no sense conclusive. The court must go further. It must be able to determine that the Land Board might not reasonably, under the same state of facts, have come to a different conclusion; * * * *'yet the rule adopted and followed by appellate courts here and elsewhere of deferring their opinions to the weight and credibility of the evidence to that of the trier of the facts in the first instance should be adhered to in the land lease cases. * * * *"* (Emphasis in original.)

This standard was followed in *Board of Trustees, Laramie County School District No. 1 v. Spiegel*, Wyo., 549 P.2d 1161 (1976), and also in *Board of Trustees of School District No. 4, Big Horn County v. Colwell*, supra.

In *Howard v. Lindmier*, supra, at 740, we further stated:

"* * * [T]he term 'substantial evidence' does not include the idea of weight of evidence, although it is more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. * * *"

Section 9–4–114(c), W.S. 1977,[4] was amended in 1979. The amendment required

---

4. Section 9–4–114(c), W.S. 1977, 1979 Cum. Supp., provides:

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, *the court shall review the whole record* or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

agency action, findings and conclusions to be supported by substantial evidence. Additionally, the amendment provided for a review of the whole record.

We said in *Board of Trustees of School District No. 4, Big Horn County v. Colwell,* supra, at 429:

> " * * * Under this standard [§ 9-4-114(c), W.S. 1977, as amended], we do not examine the record only to determine if there is substantial evidence to support the Board's decision, but we must also examine the conflicting evidence to determine if the Board could reasonably have made its findings and order upon all of the evidence before it. * * * "

In *Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), it was stated:

> " * * * [A] court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. * * * " [A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." ("Not" in brackets denotes missing word.)

The above holding was quoted with approval in *National Labor Relations Board v. Walton Manufacturing Company,* 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); and *Board of Trustees of School District No. 4, Big Horn County v. Colwell,* supra.

In this appeal we may not substitute our opinion as to the weight and credibility of the evidence for that of the Wyoming Fair Employment Commission. *Board of Trustees of School District No. 4, Big Horn County v. Colwell,* supra; *Board of Trustees, Laramie County School District No. 1 v. Spiegel,* supra; *First National Bank of Worland v. Financial Institutions Board,* supra; and *Howard v. Lindmier,* supra.

## II

In support of his claim alleging that his discharge was the result of discrimination based upon national origin and race, appellant lists seven specific incidents to illustrate discrimination.

1. On July 22, 1977, appellant was suspended. The citation stated that appellant was suspended for tire spinning after repeated warnings. Appellant complains that he had received only two verbal warnings for tire spinning.

2. That a sometime temporary foreman (Ed Beebe) and others referred to him as a "nigger."

3. That he was sent back for an extra load of dirt at quitting time on two occasions.

4. That he was not allowed to ride with the foreman when his equipment broke down.

5. That appellant's foreman yelled at him in front of other employees.

6. That he was the subject of a special meeting held by supervisors.

7. That he was watched more closely than other employees.

Succinctly stated, appellant's complaint is that people watched him, put his name in the book, and that he was not invited to ride with the foreman.

The Wyoming Fair Employment Commission made 60 Findings of Fact which were the basis of its conclusions of law and order. For the most part, these findings of fact

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations, or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute." (Emphasis added.)

deal with minutia. We will address a few that seem to be the essence of appellant's complaint. Findings 36, 37 and 38 are to the effect that employees "Beebe, Foster and Eichorn all referred to Spivey on several occasions as a 'nigger.'"

Other findings were as follows:

"43. Jackson Wiley was a white employee of Respondent.

"44. He was employed by Respondent during the period of time Mr. Spivey was employed by Respondent and was also a scraper operator.

"45. Mr. Wiley's job performance and personnel record indicates numerous safety infractions and discipline problems, in fact, more so than Complainant's.

"46. Despite such safety infractions and discipline problems no special meeting was ever held regarding Jackson Wiley.

"47. No one was ever instructed to watch Mr. Wiley more closely or to discipline Mr. Wiley only when witnesses were present.

"48. The diaries that were kept by Respondent's employees reflecting incidents that occurred on the job site reveal that Complainant's name is mentioned in the diary on some forty-three occasions.

"49. Complainant's name is mentioned in both diaries for the same incident on eleven different occasions.

"50. No other employee's name was mentioned in the diaries more than fifteen times.

"51. No other employee was mentioned in both diaries concerning the same incident more than one time."

The record made before the Commission reveals that only one incident of a racial slur was reported to management. The racial epithet by the sometime temporary foreman and others was not made in the presence of appellant and came to his knowledge secondhand. The epithet is offensive to this Court and to a great many in our society; however, there is not the slightest indication that this racial slur had anything to do with appellant's discharge. Management disciplined the temporary foreman for the racial slur. Concerning the

findings of fact about Mr. Wiley, the record shows that Wiley's record was considerably better than Spivey's; however, Wiley was also discharged.

In support of his complaint that he was watched more closely than other employees, appellant states that his name was mentioned 43 times in the journals of supervisors. He further points out that no other employee was mentioned more than 15 times: Wiley, 14 times; Fitzmaier, 14 times; Mitchell, 11 times; Slater, 15 times; McKay, 15 times.

Appellee agrees that Spivey was closely supervised after his training period. He was closely supervised because he had more problems than other employees. Because of continuous crew complaints about his disregard for safety and because of the hope that his performance might improve, he was monitored and promptly corrected. It is not surprising, therefore, that appellant's name is mentioned in supervisor journals or diaries more than other employees. It is difficult to see how this shows evidence of discrimination. Given Spivey's record of employment, it would be surprising if there were fewer entries about him than about other employees.

Finding of Fact No. 52 states:

"52. Lloyd Foster failed to allow Complainant to ride in his vehicle while Complainant's vehicle was broken down. This differed from treatment given to all other, white employees whose equipment had broken down."

This finding is contrary to Foster's testimony. Foster is the only witness who had firsthand knowledge of such a practice. If this finding were entirely correct, it is irrelevant and cannot be shown to have had anything to do with the discharge. Where is it written that a foreman has to invite someone to ride with him around the job site?

In another reported incident appellant was sent back for an extra load of dirt when he attempted to leave before quitting time. Appellant does not dispute this, but only claims that others were not given the

same treatment. There is nothing in the record to indicate that anyone other than Spivey tried to leave from work early; therefore, there was no need to send anyone other than Spivey back for an extra load of dirt.

The Commission's Findings of Fact completely ignore the positive and helpful things that appellee and its employees did or tried to do for appellant. The trial judge in his decision letter dated March 5, 1981, indicated some of these matters:

"The evidence shows that the complainant-respondent was the beneficiary of affirmative action hiring. He was soon advanced from a mill laborer to heavy equipment operator to scraper operator. He quickly progressed from a 'green-hat' status to tenure evidenced by 'red hat' status. He was described as a willing and cooperative employee during this interim period.

"The claimant-respondent was apparently held in some esteem by his fellow employees and his immediate supervisors for his erstwhile prowess as a football player with the Dallas Cowboys, albeit short-lived this endeavor was.

"The complainant-respondent was favored with an offer to a marketing position in San Francisco, work in line with his college training, if he would provide his college transcript as a prerequisite to filling this position. The transcript was never tendered and this unique offer remained in limbo for the remaining term of his employment."

The matters found by the district judge are amply supported by the record and are not controverted by appellant. The facts certainly militate against any suggestion that appellant was discriminated against because of race. In fact, preferential treatment caused other employees to complain of reverse discrimination.

In *DeGrace v. Rumsfeld*, 614 F.2d 796 (1st Cir. 1980), the court held that a plaintiff alleging racial harassment and discriminatory discharge could prevail only if he established that, but for racial harassment which his employer knew about but failed to stop, he would not have committed the infractions which led to his discharge. Moreover, the court held, plaintiff had to demonstrate that his apprehension was reasonable and his own rule infractions (in that case, repeated absenteeism) were a reasonable response to that continuing harassment:

"We agree with defendants that an employer who has taken reasonable steps under the circumstances to correct and/or prevent racial harassment by its nonsupervisory personnel has not violated Title VII. * * * It may not always be within an employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy. * * * But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race." *DeGrace v. Rumsfeld*, supra at 805.

\* \* \* \* \* \*

" * * * Not every response by the victim of racial discrimination can be excused; actions may be so outside the parameters of reasonable conduct that they cannot be tolerated. * * * While due allowance must be made for plaintiff's fear and hostility, he too had to act reasonably to bring matters to NASSW's [his employer's] attention, to communicate his position, and to cooperate with or at least not impede NASSW's good faith efforts to correct the situation." *DeGrace v. Rumsfeld*, supra at 806.

*Davis v. United States Steel Supply*, No. 802571 (September 24, 3rd Cir. 1981) is a case very similar to the case at bar. Davis, a black female, complained that she was discharged because of race. Her two principal complaints were that her coworkers made racial slurs and that her personnel file contained material which was not kept in the files of other employers. The court held that, "Davis's discharge was not based on any racial ground, but was

based on her refusal to comply with her supervisor's repeated requests to return to his office for discussion of her personal problems." The court in *Davis* stated:

"We recognize that the workplace in terms of personal relationships, is rarely free from expressions that ofttimes may affront the feelings of fellow employees. Although § 1981 [42 U.S.C.] protects against racially discriminatory acts of the employer at the workplace, it does not make the employer an absolute guarantor of a perfect work environment free from all frictions, even including those with racial overtones. Thus, sporadic disagreements, altercations, conflicts, and irritations caused by co-workers, even when they concern racial matters and cause an employee offense, cannot, without more, provide the essential predicate of a § 1981 action against an employer. "A fair reading of the instant record as a whole indicates that Davis in many cases perceived in racial terms what were no more than interpersonal incidents of the sort that arise generally in routine employee relationships at the workplace. Even granting that some of Davis's difficulties with her co-employees had racial connotations, Davis's understandable sensitivity on that score, standing alone, cannot suffice as a substitute for the proof needed to satisfy a § 1981 claim against her employer. The evidence here is abundant that during Davis's employment all steps were taken by management to discourage offending conduct and to resolve employee difficulties that had arisen when management became aware of the particular incident. The record is also clear that the critical event of which Davis complains—Davis's discharge on February 3, 1970—was neither motivated nor caused by racial animus on the part of USS."

The findings of the Fair Employment Commission, while generally supported by a modicum of evidence, are almost entirely irrelevant to the issues involved in this case. Appellant's complaints and findings of the Commission fall far short of showing racial discrimination. For the most part, appellant's complaints are similar to complaints on any job. The racial epithet is regrettable; but appellant's complaints that his employer watched him more closely than others, put his name in the book more than others, and tolerated others with worse records than he, are inconsequential. They are similar to an increasing number of complaints by people who would rather litigate than work.

The record reveals that Mr. Spivey's discharge was not based on any racial ground, but was based on insubordination and interferring with production.

After an examination of the entire record we agree with the trial judge, and therefore, affirm his disposition of the case.

Affirmed.